467 A.2d 552

**Irvin Tyrone YORK**

v.

**STATE of Maryland.**

**No. 1945, Sept. Term, 1982.**

Court of Special Appeals of Maryland.

Nov. 4, 1983.

Gary W. Christopher, Asst. Public Defender, with whom was Alan H. Murrell, Public Defender, on brief, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Andrew L. Sonner, State's Atty. for Montgomery County and Stephen J. Savage, Asst. State's Atty. for Montgomery County on brief, for appellee.

Submitted before LOWE, WILNER and ADKINS, JJ.

ADKINS, Judge.

A jury sitting in the Circuit Court for Montgomery County convicted appellant Irvin Tyrone York of robbery with a dangerous and deadly weapon, use of a handgun in the commission of a crime of violence, and battery, for which he received sentences of imprisonment for twenty years, fifteen years (consecutive) and five years (concurrent), respectively. On appeal, he raises four issues. They are:

1. Is use of an inoperable handgun in a robbery a sufficient basis for conviction of use of a handgun in a crime of violence?

2. Did the trial court err in prohibiting York from attempting to elicit testimony from his co-defendant, Demery, who had claimed his privilege against self-incrimination?

3. Did the trial court err in permitting inquiry as to York's financial status?

4. Was it illegal and beyond the trial judge's power to direct, as part of the sentence, that York never be considered for parole?

## Facts

The facts surrounding the commission of the crimes themselves are simple enough. A fact-finder could have found beyond a reasonable doubt (and the jury obviously did) that on December 1, 1981, police observed York and Jeffrey Demery (who was charged with the same offenses as York and tried jointly with him) cruising about the streets of Silver Spring in York's car. Eventually, they parked the car, walked about the streets looking in shop windows, and then entered Rochee's Hong Kong Tailor Shop, Demery leading and York following. Demery produced a Titan and Tiger .38 caliber revolver and he and York pushed the two store clerks (its only occupants) into a bathroom. York and Demery removed money from the cash register and clothing from the racks, then left the store, first walking, then running. They reentered the car with the loot and departed, with York driving. They were soon apprehended. Material from the cash register was found on York's person. The clothing from the racks was found in the car. The revolver wielded by Demery also was recovered from the car.

## The Inoperable Handgun

Testimony produced at trial suggested that the Titan and Tiger revolver found in the car would not fire, although it was fully loaded. The problem was that the gun, a cheap "Saturday night special," had been dropped and damaged in such a way that the cylinder would not revolve. This, in turn, meant that the weapon could not be fired by the exertion of ordinary pressure on the trigger, although somebody with "unusual strength" might have been able to fire it.

In any event, the police report classified the revolver as "inoperable." But a police firearms expert testified that by using a hammer and a screwdriver or a fingernail file he could restore the weapon to operable condition in about a minute's time.

On the basis of this testimony, York argued that there was insufficient evidence to convict him on the handgun charge, because an inoperable gun cannot be a handgun as that term is used in Art. 27, § 36B(d). The trial judge disagreed, although concluding that this question was one of first impression in Maryland. *See In Re Appeal No. 1124,* 27 Md.App. 468, 473–74, 340 A.2d 338 (1975). *But cf. White v. State,* 23 Md.App. 151, 165, 326 A.2d 219 (1974). He reasoned that the legislature had intended to include within the scope of § 36B(d) a weapon "designed as a handgun" when it left the factory, particularly if, at the time of its use, its inoperability could be readily remedied.

As we have noted, the earlier Maryland cases that have touched on the issue of whether a handgun must be operable to fall within the language of § 36B(d) seem to point in opposite directions. In *In Re Appeal No. 1124, supra,* we observed that the problem of inoperability raised a "very real" issue as to whether a gun "was a 'handgun' within the contemplation of Article 27, § 36B . . . ." 27 Md.App. at 474, 340 A.2d 338. On the other hand, in *White v. State, supra,* we upheld the trial judge's refusal to instruct that the statute "applied only to handguns which are operable." We found "no such prerequisite in the statute." 23 Md.App. at 165, 326 A.2d 219.

As the trial judge correctly discerned, whether an inoperable handgun falls within the ambit of § 36B(d) is a question of legislative intent. Although we think he read that intent a little broadly, we think the result reached in this case was correct.

The General Assembly included a declaration of policy when it enacted Art. 27, § 36B. After finding that "in recent years [there has] been an alarming increase in the number of violent crimes perpetrated in Maryland, and a high percentage of those crimes involve the use of handguns" (Art. 27, § 36B(a)(i)), the legislature went on to explain:

(ii) The result has been a substantial increase in the number of persons killed or injured which is traceable, in large part, to the carrying of handguns on the streets and public ways by persons inclined to use them in criminal activity. . . .

██ This language demonstrates that the paramount purpose of the General Assembly in enacting § 36B was to reduce the especially high potential for death or serious injury that arises when a handgun, as distinguished from some other weapon, is used in a crime of violence. That potential for major harm exists only when the weapon, at the time of the offense, is useable as a handgun. If it is not then so useable, its likelihood of inflicting injury is no greater than that produced by a knife or a club—bad enough, but different from the special hazard to the victim that the legislature attached to the use of handguns.

██ The legislative purpose we discern also is apparent in the definition of handgun set forth in § 36F which, like § 36B was adopted as part of Ch. 13, Laws of 1972.[1] Section 36F, subject to exceptions not here pertinent, provides that the word " 'handgun' shall include any pistol, revolver, or other firearm capable of being concealed on the person. . . . " In *Howell v. State,* 278 Md. 389, 364 A.2d 797 (1976) the Court of Appeals examined this definition. It concluded that for a weapon "to be a handgun it must be a firearm or it must be readily convertible into a firearm," that is, " 'a gun which could be explosive of projectiles. . . .' " 278 Md. at 396, 364 A.2d 797. From this it follows that a gun which, at the time of its use, is not a firearm ("explosive of projectiles") and not readily convertible to that purpose, is not a handgun under § 36B(d). Such a gun is not capable of inflicting the harm the legislature sought to prevent by the enactment of § 36B(d).

---

1. It is the § 36F definition that applies to the handgun offense established by § 36B(d), and not the broader definition contained in Art. 27, § 441(c). *Tisdale v. State,* 30 Md.App. 334, 343, 353 A.2d 653 (1976).

But to state that conclusion does not end the inquiry here. The weapon used in this case (unlike the tear gas gun in *Howell*) had been designed, manufactured and presumably sold as a firearm. *See State v. Pelzer,* 230 Kan. 780, 640 P.2d 1261 (1982). The infliction of death or serious bodily harm was its *raison d'etre.* The only factor detracting in any degree from its ability to perform that lethal function was a minor mechanical defect correctable in about a minute by the use of simple tools. Moreover, the two police witnesses who characterized the weapon as "inoperable" both in effect qualified their opinions in that regard. One, Officer Peters, said the gun wouldn't fire to a "95% degree of certainty" but that it might be fired if someone took two hands and tried to force the action. The other, Officer Bransome, believed that the gun could be fired by someone with perhaps twice his strength.

What this evidence shows is that the Titan and Tiger .38 brandished by Demery was in fact a firearm at the time of the offenses here involved. It could be fired. We do not think the legislature, in its concern for the protection of citizens against handguns used in crimes, intended a weapon to be excluded from the handgun category because of nice calculations of percentages or the relative strengths of potential users. In our view, a gun that may be "explosive of projectiles" when used is a handgun for purposes of § 36B(d). The trier of fact could have found that this gun met this criterion.[2] The evidence was sufficient to sustain York's handgun conviction.

### Demery's Testimony

Prior to the joint trial of York and Demery for the various offenses arising out of the December 18, 1981, robbery at

---

[2.] Further support for such a conclusion may be derived from the fact that the gun was loaded. One would not ordinarily load an inoperable firearm for use in a robbery. Since it was loaded, it appears that Demery, at least, thought he could fire the weapon. This permits an inference that the gun could, indeed, have been fired.

Rochee's Hong Kong Tailor Shop, Demery had pled guilty to the charges of armed robbery and battery. He had pled not guilty only to the handgun use charge. York, it will be recalled, had pled not guilty to all charges.

York's defense was that the armed robbery was all Demery's idea and that he, York, was under the influence of drugs, didn't really know what was going on, and had been frightened into participation when Demery produced the gun. In fact, during the process of tendering his guilty pleas, Demery said "York was to my back and unaware of what was going on in the store."

At the conclusion of his case, York sought to call co-defendant Demery to testify on his behalf. Counsel for Demery stated that his client "has decided to stand on his Fifth Amendment rights against self-incrimination and he will not testify." The court advised Demery that he had

a constitutional right to both testify as well as not to testify.... You are a defendant in this case. The co-defendant wishes to call you as a witness. You cannot under the circumstances be called as a witness against your will and consent.

After some further discussion, Demery said he elected not to testify. The court said that election "would be enforced." Counsel for York then proferred that he intended to question Demery only about the charges to which Demery had pled guilty. The court did not change its position, and Demery did not testify.

York now says this ruling was error because Demery could not claim his privilege against self-incrimination with respect to charges to which he had pled guilty. This contention is without merit. At the time of Demery's trial, it was possible to appeal from a judgment entered following a guilty plea.[3] Moreover, although Demery had pled guilty to three of the counts against him, he had not been sen-

---

**3.** That is no longer the case. See *Boone v. State*, 56 Md.App. 8, 466 A.2d 66 (1983).

tenced when York sought his testimony. Had Demery testified, his testimony might have affected adversely his ultimate punishment. For these reasons, among others, the Court of Appeals concluded in *Smith v. State,* 283 Md. 187, 191, 388 A.2d 539, *cert. den.* 439 U.S. 1130, 99 S.Ct. 1050, 59 L.Ed.2d 92 (1978), that "a guilty plea does not operate as a waiver of the Fifth Amendment privilege against self-incrimination, at least until sentence has been imposed."

But York argues that in any case the privilege is just that: an option to be claimed by the privileged party if he chooses to do so. It is not a prohibition against inquiry by others. 8 Wigmore, *Evidence* (McNaughton rev. § 2268 (1961)). So, says he, Demery should have been put on the stand and asked specific questions, as to each of which he could either respond or claim the privilege. *Richardson v. State,* 285 Md. 261, 401 A.2d 1021 (1979); *Royal v. State,* 236 Md. 443, 447–48, 204 A.2d 500 (1964); *Gardner v. State,* 10 Md.App. 691, 272 A.2d 410 (1971).

Demery, as co-defendant, unquestionably had the right to testify as well as the privilege not to take the stand in his own defense. *See State v. McKenzie,* 17 Md.App. 563, 576, 303 A.2d 406 (1973), and *McClain v. State,* 10 Md.App. 106, 114, 268 A.2d 572 (1970). But York also had the constitutional right to present witnesses on his own behalf. *See United States v. Bifield,* 702 F.2d 342, 349 (2d Cir.1983), *cert. den.* —— U.S. ——, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983) and *Hainesworth v. State,* 9 Md.App. 31, 35, 262 A.2d 328 (1970). It may well be that to balance fairly the competing claims of York and Demery, the trial judge should have permitted Demery to be asked specific questions, and to claim the privilege as to those matters protected by it, as was done in *Richardson, Royal,* and *Gardner,* all *supra. But cf. Midgett v. State,* 223 Md. 282, 164 A.2d 526 (1960), *cert. den.* 365 U.S. 853, 81 S.Ct. 819, 5 L.Ed.2d 817 (1961) in which the Court of Appeals did not find reversible error in the use of the same procedure used in this case, although it found the specific question and answer approach to be the preferable procedure.

■ In any case, we need not now decide whether the trial judge erred in not submitting Demery to specific questions. The issue is not preserved for appellate review. When the issue was presented during trial, counsel for York made no proffer of specific questions or the answers he anticipated. Instead, he merely told the court he would question Demery only as to matters as to which Demery had already pled guilty. As we have seen, this circumstance did not remove Demery's privilege of claiming self-incrimination as to the matters. Nor did this generalized proffer serve to preserve for our review the question of whether Demery should have been required to claim his privilege in response to specific questions. Md.Rule 1085. *See Von Lusch v. State,* 279 Md. 255, 262–63, 368 A.2d 468, 472 (1977).

### *York's Financial Status*

York testified in his own defense. On direct examination, he responded to questions about his employment status at the time of the incident and the amount of his pay. He said he used some of his salary to buy heroin, that he had used heroin on the day of the incident at Roshee's, and that he had also bought and used PCP on that day. This was apparently intended to support his theory that he had been "high" and did not know what was going on when the robbery took place. In addition, it may have been intended to show that York was reasonably well off and thus had no reason to engage in a robbery. He also testified that he had been shopping for used tires—a possible attempt to refute the State's theory that he and Demery had been cruising Silver Spring looking for an appropriate place to rob, as well as a further effort to demonstrate lack of any need for funds.

On cross-examination, York was questioned about these same matters, and admitted that he had lost the job he testified about on direct examination and that he had had only a few dollars in his pocket when he claimed to have been shopping for used tires. He now says that this was in violation of the principle expounded in *Vitek v. State,* 295 Md. 35, 453 A.2d 514 (1982) in that it was an attempt to

show that he had a motive to rob because he was impecunious. We disagree.

Unlike that in *Vitek,* the inquiry into financial status here was initiated by the defense. Once that had been done, the State was entitled to attack the inferences sought to be deduced from it by attacking the accuracy of the testimony itself. That is what was done on cross-examination. In addition, most of the questions on cross-examination were not objected to. But even if this issue is preserved for our review, we perceive no reversible error here. When a defendant has opened the door to the admission of certain testimony, he is not in a position to complain about its effect later. *Leuschner v. State,* 45 Md.App. 323, 413 A.2d 227 (1980), *vacated* 451 U.S. 1014, 101 S.Ct. 3001, 69 L.Ed.2d 385, *on remand* 49 Md.App. 490, 433 A.2d 1195.

### *"No Parole" Recommendation at Sentencing*

After imposing sentence, the judge told York that as "a part of your sentence" he was recommending "that you not ever be considered for parole, pardon or commutation." He said this recommendation would be "part of York's permanent record" and would constitute a "request which I make now as well as a directive that this be placed in your permanent record, that the Trial Court be notified of any such action that might be contemplated in your case and given an opportunity to be heard on that matter before any such authority."

York argues that these comments violated the doctrine of separation of powers in that the granting of parole is a matter for the executive branch of government, whereas the judicial branch is concerned solely with the imposition of a sentence within statutory limits and with an eye "to the prevalent modern penal philosophy of an individualized punishment." *Logan v. State,* 289 Md. 460, 481, 425 A.2d 632 (1981).

Had the judge attempted to impose a sentence without benefit of parole in the absence of statutory authority to do so, there might be something to this argument. But that

is not what he did. He made recommendations only—recommendations which the Parole Commission is free to follow or to disregard if it so wishes. Art. 41, § 112.

That the Parole Commission may, if it chooses, exercise its discretion in light of comments or recommendations of a sentencing judge is clear. COMAR 12.08.01.18A provides in pertinent part:

(1) The Commission shall have the exclusive power of parole release. In determining whether a prisoner is suitable for release on parole the Commission considers [a variety of factors and criteria].

\* \* \* \* \* \*

(3) To make these determinations [as to suitability for parole] the Commission examines:

\* \* \* \* \* \*

(g) Any reports or recommendations made by the sentencing judge. . . .

Because the sentencing judge made his recommendations at the time of sentencing instead of at some later time does not make what are clearly stated as "recommendations" a mandatory part of the sentence, nor does this fact render the sentence itself illegal.

JUDGMENTS AFFIRMED. APPELLANT TO PAY THE COSTS.