**UNITED STATES of America**

v.

**Edwin ROBSON Defendant.**

**No. 05–1428M.**

United States District Court,
D. Maryland,
Southern Division.

Oct. 13, 2005.

Jennifer Kramme, Special Assistant United States Attorney, Dept. of Air Force, Andrews AFB, MD, for Plaintiff.

Carrie Howie Corcoran, Office of the Federal Public Defender, Baltimore, MD, for Defendant.

### MEMORANDUM OPINION GRANTING IN PART DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

DAY, United States Magistrate Judge.

Transporting a handgun in the State of Maryland sometimes is unlawful, sometimes not. In this instance, it is not. Before the Court is Defendant's Motion for Judgment of Acquittal ("Defendant's Motion"), the opposition and the reply thereto. No hearing is deemed necessary. Local Rule 105.6 (D.Md.). For the reasons below, Defendant's Motion is hereby **GRANTED IN PART.**

## I. PROCEDURAL HISTORY

Location, location, location. As to the alleged handgun violations, this is a case of first impression in Maryland. It is alleged that on March 8, 2005, Edwin Robson, Defendant, drove a tractor-trailer to the North Gate of the military reservation of Andrews Air Force Base, Maryland, ("AAFB"), a federal enclave within the special maritime and territorial jurisdiction of the United States. The Government's evidence shows Defendant was stopped by civilian security personnel and, after a routine search, was charged with several offenses by federal law enforcement personnel. On June 5, 2005, a bench trial was initiated before this Court regarding three alleged violations of Maryland law, namely: (1) wearing, carrying and transporting a loaded .45 caliber semi-automatic pistol, in violation of MD. CODE. ANN., CRIM. LAW § 4–203(1)(ii) (2004); (2) wearing, carrying and transporting a loaded .45 caliber revolver, in violation of § 4–203(1)(ii); and (3) possessing and carrying a concealed dangerous weapon (machete), in violation of MD. CODE. ANN., CRIM. LAW § 4–101(c)(1) (2004). Under the Assimilative Crimes Act ("ACA"), each of the Maryland offenses is assimilated and applicable to activities occurring on AAFB. 18 U.S.C §§ 7(3)[1], 13.[2]

The controlling handgun statute makes it unlawful to "wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State." § 4–203(1)(ii). The controlling dangerous weapon statute makes it unlawful to "wear or carry a dangerous weapon of any kind concealed on or about the person." § 4–101(c)(1).

At the close of the Government's case, Defendant moved for a judgment of acquittal as to both violations of § 4–203 suggesting that the North Gate access road on AAFB was not a "highway" generally "used by the public" and therefore not within the purview of the Maryland statute, and the Government did not prove the weapons were operable. Defendant also seeks a judgment of acquittal on the final charge by suggesting that the Government did not establish that the machete was concealed. The Court took Defendant's Motion under advisement, recessed the trial and requested briefing on these issues.

## II. STANDARD OF REVIEW

■ Under the federal rule, a court may acquit a defendant on "one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." FED. R. CRIM. P. 29. A motion for judgment of acquittal will not be granted where, viewing the evidence produced at trial in the light most favorable to the Government, it is sufficient for any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *See Glasser v. United States*, 315

---

1. Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

2. Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided by section 7 of this title, is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in place at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Sloley,* 19 F.3d 149, 152 (4th Cir.1994).

## III. BACKGROUND

It is alleged that on March 8, 2005, Defendant drove a tractor-trailer to the North Gate access road of AAFB. The North Gate is open from 6:00 a.m. to 9:00 p.m. for privately owned vehicle traffic. Tr. at 33. All vehicles are subject to being searched. Tr. at 99. Signage on Interstate 495, which leads to the access road, indicates that the North Gate is the only entrance for commercial traffic to enter AAFB. Tr. at 34, 98. Testimony reveals that upon reaching the North Gate, Defendant's vehicle was directed to the "search pit" inside the base. Tr. at 32, 65–6. A search of the tractor's cab produced a .45 caliber pistol, a Colt .45 revolver and a machete on the passenger seat. Tr. at 36, 39, 57.

AAFB is not open to the public. Tr. at 131. Every gate has signs limiting access to employees and those with authorized business. Tr. at 54, 131. Civilians are permitted access if they possess military identification or other credentials. Tr. at 34. Unauthorized civilians or those without military identification must be escorted during their time on the base. Tr. at 34, 101. The Base Commander exercises absolute authority to bar the public from coming onto the base at any time. Tr. at 54–55. Unauthorized vehicles are permitted to turn around and may not enter the North Gate. Tr. at 66. Other motorists use the road as a turnaround point. Tr. at 83.

**3.** To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of Congress, become the seat of the Government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings.

## IV. DISCUSSION

### A. The Government has Failed to Establish That Defendant Transported Handguns on a Public Road or Highway.

The United States Constitution grants Congress the power, subject to the consent of the state involved, to exercise exclusive jurisdiction with respect to certain properties acquired by the United States. U.S. Const. Art. I, § 8, cl. 17.[3] The Constitution also vests in Congress the "power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." U.S. Const. Art. IV, § 3, cl. 2. The ACA subjects person on federal lands to prosecution in federal courts for violations of criminal statutes of the state in which the federal lands are located. *United ed States v. Kenneth Smith,* 965 F.Supp. 756, 758 (E.D.Va.1997). The ACA transforms a crime against the state into a crime against the federal government, thus state law becomes federal law. *See United States v. Dreos,* 156 F.Supp. 200 (D.Md. 1957).

 Congress, in enacting the ACA, sought to accomplish three purposes. First, the ACA establishes a gap-filling criminal code for federal enclaves. Second, the ACA provides for conformity in the laws governing a federal enclave and the state in which an enclave is located. Third, the ACA should give the people within a federal enclave as much protection as is afforded to those outside the enclave. *Kenneth Smith,* 965 F.Supp. at 758; *United States v. Sharpnack,* 355 U.S.

286, 292, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958) (the ACA "demonstrates a consistent congressional purpose to apply the principle of conformity to state criminal laws in punishing most minor offenses committed within federal enclaves").

The Fourth Circuit has held that, because "the [ACA] was designed to assimilate the entire state criminal law into any appropriate federal enclave, the ACA does not contemplate selective incorporation." *Kenneth Smith*, 965 F.Supp. at 758. However, "federal courts have consistently declined to assimilate provisions of state law through the ACA if the state law provision would conflict with federal policy." *United States v. Kelly*, 989 F.2d 162, 164 (4th Cir.1993). There is no conflict presented here.

The controlling Maryland handgun statute discourages the movement of handguns. Maryland courts have noted that "[t]he intent of this law is clear: To curtail the movement of handguns, whether they be carried on a person or in a vehicle." *Battle v. State*, 65 Md.App. 38, 47, 499 A.2d 200, 205 (1985).[4] Furthermore, the "handgun control legislation is designed to discourage and punish the possession of handguns on the streets and public ways." *Wieland v. State*, 101 Md.App. 1, 30, 643 A.2d 446, 460 (1994). Here, the Government alleges that the transporting of handguns took place on a "highway."

"Highway" means the entire width between the boundary lines of any way or thoroughfare of which any part is *used by the public* for vehicular travel, whether or not the way or thoroughfare has been dedicated to the public and accepted by any proper authority.

MD. CODE ANN., TRANSP. § 11–127 (2004) (emphasis added). In contrast, Maryland statute defines "private roads" as "privately owned" and "used for vehicular travel by its owner and by those having express or implied permission from the owner, but not by other persons." MD. CODE ANN., TRANSP. § 21–101 (2004).[5] We have now come to learn, that not all highways are the same.

Defendant principally relies on the very recent Fourth Circuit decision in *United States v. Smith*, 395 F.3d 516 (4th Cir. 2005). The appellant was charged with an assimilated violation of driving with a suspended license on the access road to the CIA headquarters in McLean, Virginia, a federal enclave. Smith was convicted at trial before a magistrate judge. The district court affirmed his conviction for driving with a suspended license on a "highway"[6] reasoning that "[t]he Defendant's entrance from Route 123 to the CIA access road was not barred by guards or gates and no signs indicated the access road was a restricted area [and] this satisfies the prima facie presumption that the road was open to the public and, therefore, a public highway." *Smith*, 395 F.3d at 520.

On appeal to the Fourth Circuit, the appellant argued that his conviction for

---

**4.** The Maryland handgun statute, formerly found at, Art. 27, § 36B, has been recodified without substantive change as § 4–203 of the Criminal Law Article of the Maryland Code. *Brogden v. State*, 384 Md. 631, 642, 866 A.2d 129, 135 (2005); MD. CODE ANN., CRIM. LAW § 4–203 (2004) Revisor's Note.

**5.** Alternatively, § 4–203 also proscribes the transporting of a handgun on a "road" generally "used by the public." The Maryland Code defines "road" as "a highway." MD.

CODE ANN., TRANSP. § 8–101(*o*) (2004). Therefore, the same discussion is applicable.

**6.** Under Virginia law, a "highway" is defined, in pertinent part, as "the entire width between the boundary lines of every way or place open to the use of the public for purposes of vehicular travel in the Commonwealth, including the streets and alleys." Va. Code § 46.2–100 (2004).

driving while his license was suspended should be overturned because the CIA's access road is not a "highway" under Virginia law. The appellant contended that the access road was not "open to the use of the public" as a required element of the Virginia Code. The Government argued that the appellant did not meet with any interference as he drove down the access road. Furthermore, the road was used by employees, official visitors, taxi and bus drivers, delivery trucks, and persons in search of directions.

Based on Virginia law, the *Smith* court found that meeting or not meeting with interference while on the road was not dispositive on the issue of being a highway. Furthermore, "parties bringing authorized personnel or deliveries are not members of the public at large but are 'those with authorized business' whom the government admits are permitted to use the roadway." *Id.* at 521. The *Smith* Court found "the presence of signs barring public entry establishes that the access road is not open to public use, and thus is not a highway under Virginia law." *Id.* The Court stated "[b]ecause the general public is not permitted on the access road, it is not 'open to the use of the public for the purposes of vehicular travel.'" *Id.* (*citing Flinchum v. Commonwealth,* 24 Va.App. 734, 485 S.E.2d 630 (1997) (holding that a road not "open to the public at all times" was not a "highway")).

■ There is no Maryland case law deciding whether access roads leading to a federal enclave, such as AAFB, is a "highway" within the meaning of the controlling statute. However, Defendant contends that under Maryland law, the conclusion reached in *Smith* is inescapable. Despite the best efforts of the Government, the logic of the defense is true. When determining whether a "highway" exists "[t]he test to be applied is the right of the public to travel on the road or driving on a parking lot, and not the actual exercise of that right." *Locklear v. State,* 94 Md.App. 39, 45, 614 A.2d 1338, 1340 (1992) (*quoting Walmsley v. State,* 35 Md.App. 148, 152, 370 A.2d 107, 109 (1977)). Defendant argues that under *Walmsley* and its companion case, *Akins v. State,* 35 Md.App. 155, 370 A.2d 111 (1977), the AAFB North Gate access road is not a "highway" because it is not used by the public for vehicular travel.

In *Walmsley,* the defendant was convicted of driving an automobile on a parking lot belonging to a tavern, while his privilege to drive had been revoked. The appellant appealed his conviction for driving while suspended on any public "highway." The *Walmsley* court stated "it cannot be questioned that George's Tavern could have limited the driveway and parking lots to its employees or to its patrons. The public, other than business invitees, had no right to enter upon the driveway or to park their vehicles." *Walmsley,* 35 Md. App. at 154, 370 A.2d at 110. The court inferred that the driveway and parking lot were "subject to almost limitless regulation by the owners of the property, to the point that the driveway and the parking area could be completely eliminated at whim." *Id.,* 370 A.2d at 110. As a result, "the private parking and driveway do not fall within the scope of 'used by the public for purposes of vehicular travel.'" *Id.,* 370 A.2d at 110. Thus, the *Walmsley* court reversed the appellant's conviction for driving while suspended.

In *Akins, Walmsley's* companion case, the defendant was convicted of driving on a public highway while his license was revoked. On appeal, the State conceded that the officer saw defendant operating the vehicle only in the shopping center parking lot and exit lane, which were not publicly owned, operated, or maintained.

The *Akins* court, relying solely on *Walmsley,* reversed the conviction for driving while suspended where the driving occurred in a parking lot. The court opined:

> [A] parking area and its roadways within a shopping center are considered to be private because the right to use them by the public is not a general right, but is limited to those persons who have implied permission to do business with the owner, and that the owner retains the right to exclude anyone at anytime.

*Akins,* 35 Md.App. at 156, 370 A.2d at 112. The degree of control the private owner exercises over the property is determinative of whether the property is "used by the public."

In *Locklear,* the defendant was convicted of driving while suspended and driving while intoxicated. The defendant appealed his convictions arguing that his conduct did not take place on a public highway or private property that "is used by the public in general." The *Locklear* court reversed appellant's conviction for driving while his license was suspended or revoked. Even though the statute extended to private property that "is used by the public," the parties stipulated that the property on which the appellant was driving was marked "No Trespassing." *Locklear,* 94 Md.App. at 46, 614 A.2d at 1341. Thus the court reversed the conviction on the grounds that state failed to establish the mound was "used by the public in general." *Id.,* 614 A.2d at 1341. However, the *Locklear* court affirmed his driving while intoxicated conviction because those statutory provisions applied throughout the State, "whether one is driving on or off a highway" and extends to even private property. *Id.* at 47, 614 A.2d at 1341;

*Rettig v. State,* 334 Md. 419, 639 A.2d 670 (1994).[7]

■ The degree of control the private owner exercises over the property is determinative of whether the property is "used by the public." From a review of the relevant Maryland law, it is clear that in order to be considered "used by the public" that open access to all members of the public is necessary. To the extent that persons can be excluded, the property is considered private. Here, like in *Locklear, Akins, Walmsley* and *Smith,* the owner can exercise plenary control over the property to exclude the general public and only those with express or implied permission can freely enter the property. The Court notes that "[p]enal statutes are to be strictly construed." *Howell v. State,* 278 Md. 389, 392, 364 A.2d 797, 799 (1976); *United States v. Childress,* 104 F.3d 47, 51 (4th Cir.1996). As a result, the AAFB North Gate access road is not a "highway" under the Maryland Code for the purposes of § 4–203.

The result reached here is supported by the reasoning of the *Akins* court. That court noted, the private "owner of the center had an absolute right to control traffic patterns for the use of the areas and could, and absolutely did, promulgate rules and regulations as to the manner in which the area could be used. At his discretion the area could be closed or opened as the owner saw fit." *Akins,* 35 Md.App. at 158, 370 A.2d at 112. This is directly analogous to the power of the Base Commander of AAFB. Testimony at trial established the Base Commander's plenary power over AAFB. The Base Commander exercises absolute authority to bar the public from coming onto the

---

**7.** This distinction leads to the conclusion that alcohol related motor vehicle offenses are still subject to prosecution on AAFB.

base at any time. Thus, under Maryland law, AAFB is private property.

The Government argues that AAFB is "public" within the phrase "used by the public" in § 4–203. AAFB's community is comprised of military members, their dependants and employees of the various organizations and businesses on base. The Government argues that "the only reasonable conclusion" is that these people comprise "the public." Unfortunately, a similar argument was not successful in *Smith* and is likewise doomed here.

In summary, the Government has failed to set forth a *prima facie* case that Defendant was wearing, carrying or transporting a handgun in a vehicle on a public road or highway. Accordingly, Defendant's Motion is **GRANTED** as to counts one and two.

## B. Direct Evidence of Operability of the Handgun is not Required in the Government's Case Under the Maryland Handgun Statute.

■ Turning to the second issue, there must be affirmative evidence that the handguns were in working condition. Under § 4–203, a "handgun" is "a pistol, revolver, or other firearm capable of being concealed on the person." MD. CODE ANN., CRIM. LAW. § 4–201(c)(1) (2004). To be a "handgun," "it must be a firearm or it must be readily or easily convertible into a firearm." *Howell v. State*, 278 Md. 389, 396, 364 A.2d 797, 801 (1976). Furthermore, "to be a firearm it must propel a missile by gunpowder or some such similar explosive." *Id.* In short, operability is required for criminal possession of a handgun. *See Braxton v. State*, 123 Md.App. 599, 652, 720 A.2d 27, 53 (1998). However, "operability may be proved solely by circumstantial evidence" because there is no distinction between direct and circumstan-

tial evidence. *Mangum v. State*, 342 Md. 392, 676 A.2d 80 (1996).

■ Direct evidence, test-firing, is not required to prove operability of a firearm. *Id.* at 397, 676 A.2d at 82. The *Mangum* court quoted with approval several instances of a finding of the operability of handguns without direct evidence including: (1) visual inspection without expert testimony, (2) carrying a weapon for protection, (3) familiarity with firearms, and, (4) possession of ammunition, loaded weapon and shells. *Id.* at 400, 676 A.2d at 84.

■ Here, testimony was offered to show that the handguns were loaded. A loaded handgun is enough to raise an issue for the trier of fact. In the leading case, *York v. State*, 56 Md.App. 222, 467 A.2d 552 (1983), the court found that the handgun was operable despite the fact that it had a mechanical defect and was originally classified by the police report as "inoperable." There, the court found the weapon to be operable despite the fact that one police officer testified the gun would not fire to a "95% degree of certainty" but that it "might" be fired if someone used two hands to force the action. *York*, 56 Md. App. at 230, 467 A.2d at 556. The other police officer testified that he "believed that the gun could be fired by someone with perhaps twice his strength." *Id.*, 467 A.2d at 556. The *York* court found their conclusion was further supported by "the fact that the gun was loaded [since one] would not ordinarily load an inoperable firearm for use in a robbery." *Id.* at 230 n. 2, 467 A.2d at 556 n. 2.

The Government's evidence tends to show that both handguns were recovered loaded with ammunition. The weapons were located in the tractor-trailer cab within a short distance from Defendant, though not within his wingspan. The evidence shows that Defendant made an attempt to find an amnesty box to surrender

his weapons with the intent to reclaim them when he left the base. The evidence at the close of the Government's case is sufficient for the trier of fact to establish the operability of the handguns. However, given the Court's ruling in Section A above, counts one and two are no longer before the Court.

### C. Whether Defendant was Wearing or Carrying a Concealed Dangerous Weapon is a Question of Fact.

■ Maryland law states, in pertinent part: "A person may not wear or carry a dangerous weapon of any kind concealed on or about the person." MD. CODE. ANN., CRIM. LAW § 4–101(c)(1) (2004). There are three distinct elements necessary to constitute a violation: (1) the weapon in question must be one of the weapons listed or considered to be a dangerous or deadly weapon, (2) the person must be wearing or carrying a weapon, and (3) the weapon must be concealed upon or about the person. *In re Colby H.*, 362 Md. 702, 711–12, 766 A.2d 639, 644–45 (2001). Here, the issue is whether a machete located in plain view on the front seat of a tractor trailer, is a concealed dangerous weapon.

■ The test for concealment was first enunciated in *Shipley v. State*, 243 Md. 262, 220 A.2d 585 (1966):

> By a recognized test a weapon is concealed if it is so situated as not to be discernible by ordinary observation by those near enough to see it if it were not concealed who would come into contact with the possessor in the usual associations of life, but absolute invisibility is not required.

*Id.* at 269, 220 A.2d at 588–89. In *Shipley*, the court held that a dirk knife carried on the floor of an automobile was concealed within the meaning of the statute. This holding was based on the fact that even though the knife was visible by ordinary observation when the driver was out of the car, it was not visible when he was occupying the driver's seat because "the knife would have been shielded at night from ordinary observation by his legs and feet." *Id.* at 269, 220 A.2d at 589.

In *Crosby v. State*, 2 Md.App. 578, 236 A.2d 33 (1967), the Court held that a gun stuck in the front of appellant's pants was concealed within the meaning of the statute. In that case, the evidence showed appellant was arrested after he alighted from a taxicab. There, the appellant was wearing a brown leather jacket, reaching about two inches below the belt line. The jacket was not buttoned and as he got out of the cab, he was facing the officer. The officer saw the handle of a gun which was tucked inside the front of appellant's pants. The Court held that before the appellant got out of the cab, the gun was not discernible by ordinary observation and was therefore concealed under the test enunciated in *Shipley*.

■ Here, the Government's evidence tends to establish that the machete found in Defendant's tractor trailer was sitting openly on the passenger's seat. The search occurred during daylight hours. A tractor trailer is higher off the ground than an ordinary vehicle which prevents objects in the cab generally from being seen at street level. However, as soon as security stepped up to the passenger's window of the tractor, they noticed the machete in a sheath. The question of concealment is for the trier of fact. Given the posture of this case, a ruling on this portion of Defendant's Motion is reserved until the close of the evidence.

### V. CONCLUSION

For the forgoing reasons, the roads within AAFB are not "highways" under the Maryland Code and Defendant's Mo-

tion for Judgment of Acquittal is **GRANTED IN PART** as to counts one and two of the criminal complaint. The trial will resume on count four when the Court reconvenes on October 31st, 2005 at 11 a.m.

### *ORDER GRANTING IN PART DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL*

For the reasons stated in the accompanying Memorandum Opinion, it is this 13th day of October, 2005, hereby **ORDERED** that Defendant's Motion for Judgment of Acquittal is **GRANTED IN PART** as to counts one and two of the criminal complaint. The trial will resume on count four when the Court reconvenes on October 31st, 2005 at 11 a.m.