### UNITED STATES of America

v.

### Laurence TAYLOR.

### Criminal Action No. 05–1078 PWG.

United States District Court,
D. Maryland.

July 31, 2006.

---

Laurence Taylor, Bel Air, MD, pro se.

Michael Clifford Hickey, Jr., Hickey and Windsor PA, Edgewood, MD, for Defendant.

Paul A. Marone, Office of the Staff Judge Advocate, Aberdeen Proving Ground, MD, for Plaintiff.

## MEMORANDUM

GRIMM, Chief United States Magistrate Judge.

Defendant, Laurence J. Taylor, has moved to dismiss a criminal complaint charging him with a violation of MD.CODE ANN., TRANSP. § 16–303(c) for driving a motor vehicle with a suspended license. Mr. Taylor was cited on January 23, 2005, when a routine identification check at the Maryland gate of Aberdeen Proving Ground ("APG"), a federal military installation, revealed that his license to drive was both suspended and revoked. Section 16–303, which is assimilated under 18 U.S.C. §§ 7 and 13, applies to individuals driving on a "highway" or any property specified in MD CODE ANN., TRANSP. § 21–101.1. Defendant, citing recent Fourth Circuit decisions, contends that the roads on APG are not highways within the statutory definition, and consequently, that he cannot be charged under § 16–303. On May 9, 2006, I issued an order denying Defendant's motion without prejudice to it being renewed at trial.

The case was tried before me, without a jury, with Defendant's consent on June 22, 2006. At trial the government produced

evidence supporting its argument that the charge could be sustained, and the defendant also presented evidence. Following the evidentiary hearing I again denied the Defendant's motion for the reasons that follow,[1] and found him guilty of the § 16–303 violation. He was then offered, and accepted, probation before judgement under MD.CODE ANN., CRIM. PROC. § 6–220(b).

## FACTS

The following facts were proved during the trial, or judicially noticed by the court pursuant to Fed.R.Evid. 201. Aberdeen Proving Ground (APG), established by the U.S. Army in 1917 as a facility for the design and testing of ordnance material, occupies over 72,500 acres in Harford County, Maryland. The property is composed primarily of two peninsulas separated by the Bush River, the Aberdeen area to the north, and Edgewood area to the south. Approximately 4,000 to 5,000 military personnel are assigned to APG. The base also employs another 7,000 civilians, 4,000 civilian contractors and 500 civilian employees of non-affiliated facilities such as restaurants, shops and recreational facilities. All civilian employees and 25 to 30 percent of military personnel live outside APG and commute onto the facility daily. Over 2,000 military members live on APG. Additionally, more than 18,000 military retirees and retiree family members routinely visit APG to shop at the Post Exchange ("PX") or commissary, use the recreational facilities, or receive services. Children of service members living on the installation attend local schools outside APG and are picked up and returned to the installation daily by county school buses. During fiscal year 2003, APG's payroll totaled $653.3 million, with $520 million paid to employees living in Harford County. The post is

the largest employer in Harford County and one of the largest in the State of Maryland.

Drive down the main streets of the Aberdeen Area of APG and you will see a gas station with convenience store, a medical, dental and veterinary facility, a church, a museum, a shopping center with a laundry facility, bowling alley, Burger King restaurant, tire store, movie theater, commissary (the military equivalent of a supermarket), a police and fire station, which is serviced by civilian police and firefighters, a post office, library, and gymnasium—in short, you will see "main street USA." APG also has 2 golf courses, swimming pools, picnic areas with outdoor equipment rentals, recreation facilities, 2 credit unions, and a Bank of America. All of these recreational and commercial facilities are open to the public, and most stay open based on their ability to conduct business without any funding support from the Army. The installation also offers a large hunting program and launch ramps for access to waterways, both of which are available to the public. Finally, APG maintains an Ordnance Museum that receives 100,000 yearly visitors, and the base hosts a number of special events open to the public throughout the year, including the Army Soldier Show, and commemorative events for Black History month and the Holocaust. The base periodically hosts musical concerts that are open to the public, including a recent event attended by over 11,000 people, most of whom had no association with APG and entered solely to view the concert.

Two state highways, Maryland Route 22 and Maryland Route 755 enter APG. While both the Aberdeen and Edgewood Areas have multiple entry gates, a least one en-

---

**1.** I acknowledge with gratitude the assistance of Todd Hesel, a University of Maryland School of Law student who served as an intern in my Chambers and significantly assisted in the research and writing of this opinion.

trance in each area is open to visitors twenty-four hours per day, year-round. A 2003 traffic study showed that the installation received 18,800 entries a day on average. APG is an open post, though all visitors must display some type of identification to gain entry. Any visitor with a federal ID card may proceed through the gate, while non-military personnel without federal ID must display a valid state driver's license and offer a legitimate reason for entering the premises. They then are directed to a guard post to obtain a day pass, which requires a driver's license and vehicle registration. Passengers also must display a valid picture ID card. Informal studies in both 2005 and 2006 showed that just over 2,000 day passes were issued to non-commercial, nonmilitary visitors in a one week period. Legitimate reasons for entry include the use of any of the recreation or retail facilities, as well as hunting or use of the boat ramps. Anyone that fails to provide such a valid reason may be excluded by the civilian police officers manning the base's entry points. Commercial drivers also are given access to the post subject to a set of inspection and check procedures.

The entry policy at APG, as with all U.S. military facilities world wide, is subject to a threat condition level and may be modified at the discretion of the base commander at any time, including a complete closure. The current status of 100 percent I.D. check was put in place at APG following September 11, 2001, however, for certain special events, such as the recent Army concert, members of the public are allowed to drive onto to the installation without presenting any identification. Finally, the roads of APG have posted speed limits, are controlled by traffic control and other devices, and are regularly patrolled by a civilian police force that enforces the Maryland Motor Vehicle Law, including the "rules of the road" found at Title 21 of the Maryland Transportation Article.

Even to the casual observer, the areas of APG relevant to this case look very much like every other town of similar size in Maryland.

## DISCUSSION

■ The Assimilative Crimes Act ("ACA"), 18 U.S.C. § 13, extends state law to federal enclaves located within that jurisdiction. The goals of Congress were threefold: (1) to provide gap-filling criminal code for federal enclaves, (2) to provide uniformity between the federal enclave and the state where the federal enclave is located, and (3) to ensure residents within the federal enclave have the same protections as the residents of State outside the federal enclave. *United States v. Kenneth Smith*, 965 F.Supp. 756, 758 (E.D.Va.1997).

Aberdeen Proving Ground is a federal enclave as defined in 18 U.S.C. § 13 and is thus subject to Maryland criminal statutes incorporated by the ACA. This includes § 16–303 of the Maryland Transportation Article which states:

(c) *Suspended licenses generally.*—A person may not drive a motor vehicle on any *highway* or on *any property specified in § 21–101.1* of this article while the person's license or privilege to drive is suspended in this State. (emphasis added)

A highway is defined in Maryland Transportation Article § 11–127 as "the entire width of boundary lines of any way or thoroughfare of which any part is used by the public for vehicular traffic." Alternately, Section 21–101.1(b)(1) extends the offenses listed in § 16–303 to "any private property that is used by the public in general."

■ The issue then is whether the roads on APG are "highways" or "private property that is used by the public in general." The defendant, pointing to the base commander's absolute right to deny or restrict

access to the installation, contends that APG roads are not highways within the statutory definition. The government counters by pointing to the extensive civilian use of base facilities, arguing that the roads are "highways" by virtue of the expansive public access. Notwithstanding the status of APG roads as "highways," there remains the alternate possibility that they are "private property that is used by the public in general." Though a number of cases have addressed the definition of a highway, there is less guidance on the meaning of the second clause presented in § 21–101.1(b).

Cases examining whether roads on federal enclaves are "highways" under Virginia law, which is substantially similar to Maryland's, have focused on the extent of public use of those roads. *United States v. Smith*, 395 F.3d 516 (4th Cir.2005); *United States v. Adams,* 426 F.3d 730 (4th Cir.2005); *United States v. Spencer*, 422 F.Supp.2d 589 (E.D.Va.2005); *United States v. Scott*, No. 05–5100, 2006 WL 1867344 (4th Cir. July 6, 2006) (unpublished). In *Smith*, a lost motorist under the influence of alcohol approached a CIA gate seeking directions and an ensuing check of the defendant's licensing status revealed that it was suspended, resulting in a citation. *Id.* at 517–18. In concluding that the road was not a highway and reversing the conviction under the ACA, the Fourth Circuit focused on the presence of signs permitting only employees and those with authorized business onto the property, plainly establishing that the road was not open to public use. *Id.* at 520.

Following the reasoning of *Smith*, *United States v. Adams* held that a national park road, which had been shut down to repair damaged caused by a hurricane, was not open to public use and consequently was not a highway under Virginia law that had been assimilated under the ACA. *Adams*, 426 F.3d at 732. Again, signs were posted at the entrances prohibiting unauthorized entry and several press releases were issued to inform the public that the wildlife refuge was closed until further notice. *Id.* The court concluded that the prohibition on public access divested the road of its highway status and reversed the defendant's conviction for driving with a suspended or revoked license. *Id.*

The Defendant argues that *Smith* and *Adams* support his motion, and at first blush they do. However, the facts of both these cases are significantly distinguishable from the facts of this case, and the evidence before me shows substantially greater public access to the roads of APG than was the case in either *Smith* or *Adams*.

In *United States v. Spencer*, a case with facts more closely resembling the present dispute, the Court found that a road leading into Fort Belvoir was a highway because the public was allowed virtually unimpeded access during daytime hours. *Spencer*, 422 F.Supp.2d at 592. In distinguishing *Smith*, *Spencer* observed that besides an I.D. check for vehicles without access decals, drivers were allowed entry whether they had business at Fort Belvoir or were simply passing through. *Id.* Similar to APG, signs notified visitors of the conditions for entry and that the garrison commander had the authority to institute restrictions beyond those listed on the sign, but unlike *Smith*, the roads, like those on APG, were clearly open to public travel. *Id.* at 592.

In a recent unpublished opinion,[2] *United States v. Scott*, the Fourth Circuit rejected

---

**2.** Although unpublished Fourth Circuit opinions may not be cited as precedent, they nonetheless have utility because they provide an analytical framework to compare with factually similar cases that must be decided.

an argument that a road outside the main gate of Fort Lee was not a highway under Virginia law. *Scott*, 2006 WL 1867344, at *1. Much like the entry process at APG, non-affiliated drivers and those without an entry decal were required to present a driver's license and vehicle registration in order to obtain a day pass which would allow them to drive freely on the Fort Lee roads. *Id.* The court observed that public use of the roads, subject to minimal restrictions, distinguished the case from *Smith* and *Adams*, where the roads were entirely closed to the public. *Id.*

Turning to Maryland law, decisions of this Court since *Smith* have looked to Maryland appellate rulings in concluding that the classification of a road as a "highway" depends on the *right* of the public to travel on the road, rather than the actual exercise of that right. *United States v. Robson*, 391 F.Supp.2d 383 (D.Md.2005); *United States v. Patrick*, No. CRIM 05–3950M, 2006 WL 83505 (D.Md. Jan.12, 2006); *United States v. Collins*, No. 05–1387, 2006 WL 278548 (D.Md. Jan.31, 2006). In *Robson*, the defendant challenged his alleged violation of Md.Code, Crim. Law § 4–203(1)(ii) for transporting a handgun on a highway by arguing that the North Gate of Andrews Air Force Base, where the stop and search occurred, was not a highway. *Robson*, 391 F.Supp.2d at 384. The court cited both *Smith* and the Maryland Court opinions *Walmsley, Akins* and *Locklear*[3] in holding that the degree of control the private owner exercises over the property is determinative of whether the property is "used by the public" under the Maryland definition of a "highway." *Id.* at 389. Given the base commander's absolute authority over the installation, including the power to deny public access at anytime, Judge Day ruled that the base

was private property and the North Gate road was not a highway. *Id.* at 389–90.

Following *Smith* and *Robson*, *Patrick* found that the right of the public to travel roads on the National Institutes of Health ("NIH") federal enclave was a privilege rather than a right, and was contingent on providing a bona fide purpose for entry and compliance with NIH security procedures. *Patrick*, 2006 WL 83505 at *5. Consequently, Judge Connelly held that the NIH road was not a highway and could not support a conviction under § 16–303 for driving with a suspended license. *Id.* at *6. However, *Patrick* recognized the alternate basis for a conviction provided in § 16–303, not available under the analogous Virginia statute, through the incorporation of property listed in § 21–101.1, specifically § 21–101.1(b)(1) "private property used by the public in general." *Id.* at *7. Because the government failed to produce evidence establishing that the NIH enclave fell within this provision, there was no basis for a conviction under this alternative method. *Id.*

Most recently, *Collins* applied the same test for a "highway" under facts similar to *Robinson* and *Patrick* to conclude that a road on the National Naval Medical Center, in Bethesda Maryland, was not a highway. *Collins*, 2006 WL 278548 at *4.

The cases decided by this Court have relied principally on a series of Maryland appellate court decisions overturning convictions under § 16–303, or its predecessor, Md.Code Ann., Art. 66 ½, § 6–303, by interpreting the existence of a "highway" under § 11–127 to depend on the *right* of public use rather than the *extent* of use. *Walmsley v. State*, 35 Md.App. 148, 370 A.2d 107 (1977); *Akins v. State*, 35 Md. App. 155, 370 A.2d 111 (1977); *Locklear v.*

---

**3.** *Walmsley v. State,* 35 Md.App. 148, 370 A.2d 107 (1977); *Akins v. State,* 35 Md.App. 155, 370 A.2d 111 (1977); *Locklear v. State,* 94 Md.App. 39, 614 A.2d 1338 (1992).

*State,* 94 Md.App. 39, 614 A.2d 1338 (1992). In *Walmsley* the defendant was stopped and cited in a tavern parking lot for driving with a canceled, suspended or revoked license. *Walmsley,* 35 Md.App. at 150–51, 370 A.2d 107. The court articulated the test for a highway as "the right of the public to travel on the road, driveway or parking lot, and not the actual exercise of that right." *Id.* at 152, 370 A.2d 107. Thus, the parking lot was not a highway because right of use was limited to tavern patrons and subject to the right of the owner to exclude anyone at anytime. *Id.* at 154, 370 A.2d 107. In a companion case, *Akins,* the Court used the same analysis to conclude that a shopping center parking lot was limited to those with implied permission to do business with the owner, and therefore not a highway. *Akins,* 35 Md. App. at 155, 370 A.2d 111.

In *Locklear* the Court overturned the appellant's conviction for driving with a suspended or revoked license because the evidence showed only that he had driven on dirt mounds on private property marked "No Trespassing." *Locklear,* 94 Md.App. at 46, 614 A.2d 1338. Addressing the alternate possibility of upholding the conviction under § 21.101.1(b)(1), the Court found nothing in the facts indicating the area was "used by the public in general." *Id.*

Under the Fourth Circuit decisions interpreting Virginia law, APG would likely qualify as a highway. The policy at APG of permitting extensive public entry, albeit subject to certain restrictions, more closely resembles the facts in *Scott,* as opposed to *Smith,* where the CIA road was entirely closed to the public. Although *Scott* was an unpublished decision, and therefore not entitled to precedential weight, the same reasoning is evident in *Spencer,* which found that the roads on Ft. Belvoir were highways because extensive public access was permitted. *Spencer,* 422 F.Supp.2d at

592. Nonetheless, the Maryland law, unlike its Virginia counterpart, has been interpreted to depend on the owner's absolute right to exclude the public rather than the extent of public use. *Compare Scott,* 2006 WL 1867344, at *1; *Spencer,* 422 F.Supp.2d at 592; *with Walmsley,* 35 Md. App. at 150–51, 370 A.2d 107 (test is the right to travel and not the actual exercise of that right). I am required to follow Maryland precedent in determining whether APG's roads are "highways" under § 16–303(c). *United States v. King,* 824 F.2d 313, 315 (4th Cir.1987) (ACA assimilates the entire substantive criminal law of the state, including laws relating to the definition and scope of an offense and laws governing the manner in which an offense is to be punished); *See also United States v. Robinson,* 495 F.2d 30, 33 (4th Cir.1974) (ACA was designed to assimilate the entire state substantive criminal law into any appropriate federal enclave and does not contemplate selective incorporation of this law).

In the present case, there is no question that the garrison commander has absolute authority over the base, including the right to completely bar public entry. Thus, if the provisions of § 16–303 were applicable only to highways, APG might very well be exempt under Maryland law despite the apparent absurdity of such a result given the facts of this case. However, § 16–303 is not limited to "highways," but also reaches any property specified in § 21–101.1, which includes "private property that is used by the public in general." Despite the lack of case law interpreting the meaning of "used by the public in general," the structure of the Maryland Transportation Code itself and the rules for statutory construction provide some insight as to its applicability to this case.

If the test for "private property used by the public in general" mirrored that for a

"highway" by examining the *right* to use, rather than the *degree* of use, the second portion of the statute would be surplusage and therefore unnecessary. This Court is not, as matter of statutory construction, permitted to assume that the legislature wrote into law something that was to be meaningless or completely cumulative with the preceding clause. *Moore v. State*, 388 Md. 446, 453, 879 A.2d 1111 (2005). This is particularly true if such an interpretation would have the inimical effect of rendering inapplicable to APG nearly the totality of the "rules of the road" codified at Title 21 of the Maryland Transportation Article. This is so because § 21–101.1 states, relevantly, that Title 21 (rules of the road) govern highways and private property used by the public in general. Thus, if the roads of APG are neither "highways" nor "private property that is used by the public in general," then, with the exception of the offenses identified at § 21–901 (reckless, negligent or impaired driving, fleeing or eluding police), the rules of the road would be inapplicable. This would mean that motorist could ignore traffic signs and signals, right of way rules and speeding restrictions without adverse legal consequence.

 When evaluating a statute, the general rule in Maryland is to read the words in context and give them their ordinary meaning. *Harford County v. University*, 318 Md. 525, 529, 569 A.2d 649 (1990). In some cases, "the language in question [is] so clearly consistent with apparent purpose (and not productive of any absurd result) that further research [is] unnecessary." *Kaczorowski v. Mayor and City Council of Baltimore*, 309 Md. 505, 515, 525 A.2d 628 (1987). Courts must avoid a construction of a statute that is unreasonable, illogical, or inconsistent with common sense. *Gwin v. Motor Vehicle Admin.*, 385 Md. 440, 462, 869 A.2d 822 (2005).

Here, the purpose of including property specified in § 21–101.1 was clearly to cover those roads which might not meet the definition of a "highway," but otherwise receive significant public use. A contrary conclusion would not only assume the legislature incorporated an entirely redundant provision into the statute, but would also lead to the absurd and unreasonable result of exempting roads on federal enclaves like APG, which are traveled by thousands of ordinary citizens, from the most basic traffic safety laws. Consequently, "used by the public in general" must be a fact specific inquiry dependent on the extent of public use, as opposed to the owner's right to exclude the public. This is also supported by statements of the courts in *Patrick* and *Locklear* that they lacked sufficient evidence to determine whether the roads were used by the public in general. *Patrick*, 2006 WL 83505 at *7; *Locklear*, 94 Md.App. at 46, 614 A.2d 1338.

There is no such lack of evidence in the present case. Informal studies show that APG issued approximately 2,000 day passes to members of the general public weekly, giving access to wide array of retail and recreational facilities. These include multiple golf courses, hunting grounds, boat launches, shops and restaurants. In addition, the base takes active measures to invite members of the community and visitors onto the installation by promoting its Ordnance Museum with signs on I–95 and by hosting special commemorative and concert events, which in some cases do not even require an I.D. check for entry. In short, APG looks and functions like any other large community in Maryland. In fact, APG is the principal employer in Harford County and one of the largest in the State. Manifestly, on the record before me, the roads of APG are used by the public in general.

The remaining issue is whether APG is "private property." That word is not defined in § 21–101. Accordingly, the ordinary definition of the word may be used. *See, e.g., Atkinson v. State,* 331 Md. 199, 215, 627 A.2d 1019 (1993) ("When interpreting a statute, we assume that words have there ordinary and natural meaning."). The Webster's New Collegiate Dictionary, Ninth Edition, defines "private" as "intended for or restricted to the use of a particular person, group or class." APG, a gated military installation, meets this definition. Because it is private property, the roads of which are used by the public in general, it meets the second prong of § 21–101.1. Therefore, by its own terms § 16–303 is applicable and the Defendant's motion must be denied.