34 A.3d 513

**Rodney Taureen MOORE**

v.

**STATE of Maryland.**

**No. 20, Sept. Term, 2010.**

Court of Appeals of Maryland.

Dec. 22, 2011.

Martha Gillespie, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

James E. Williams, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, *MURPHY, ADKINS, and BARBERA, JJ.

BATTAGLIA, J.

We are asked to determine whether operability is a prerequisite for a handgun to be considered a "firearm," as it is defined in Section 5–101(h)[1] of the Public Safety Article,

---

* Murphy, J., participated in the hearing of this case as an active member of this Court, but because of his retirement did not take part in the conference and adoption of the opinion.

1. Section 5–101(h) of the Public Safety Article provides:
   (h) *Firearm*. (1) "Firearm" means:
   (i) a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; or
   (ii) the frame or receiver of such a weapon.
   (2) "Firearm" includes a starter gun.

Maryland Code (2003), in order to sustain a conviction for possession of a regulated firearm by a disqualified person under Section 5–133(c) [2] of the Public Safety Article, Maryland Code (2003).

---

All references to Section 5–101(h) throughout are to the Public Safety Article, Maryland Code (2003), unless otherwise noted.

2.  Section 5–133(c) of the Public Safety Article provided:

(c) *Penalty for possession by person convicted of crime of violence.* (1) A person may not possess a regulated firearm if the person was previously convicted of:

(i) a crime of violence; or

(ii) a violation of § 5–602, § 5–603, § 5–604, § 5–605, § 5–606, § 5–607, § 5–608, § 5–609, § 5–612, § 5–613, or § 5–614 of the Criminal Law Article.

(2) A person who violates this subsection is guilty of a felony and on conviction is subject to imprisonment for not less than 5 years, no part of which may be suspended. .

(3) A person sentenced under paragraph (1) of this subsection may not be eligible for parole.

(4) Each violation of this subsection is a separate crime.

All references to Section 5–133 throughout are to the Public Safety Article, Maryland Code (2003), unless otherwise noted. Since 2003, Section 5–133 has been amended, although no amendments address the issue of handgun operability. Section 5–133 was recodified, effective October 1, 2010, to include an exception for individuals under a civil protective order requiring the surrender of a regulated firearm. 2010 Md. Laws, Chap. 712 (recodified at Maryland Code (2003, 2010 Supp.), § 5–133 of the Public Safety Article). Section 5–133(c) was amended, effective October 1, 2011, as follows:

(c) *Penalty for possession by person convicted of crime of violence.*—

(1) A person may not possess a regulated firearm if the person was previously convicted of:

(i) a crime of violence; or

(ii) a violation of § 5–602, § 5–603, § 5–604, § 5–605, § 5–612, § 5–613, or § 5–614 of the Criminal Law Article.

(2)(i) Subject to paragraph (3) of this subsection, a person who violates this subsection is guilty of a felony and on conviction is subject to imprisonment for not less than 5 years and not exceeding 15 years.

(ii) The court may not suspend any part of the mandatory minimum sentence of 5 years.

(iii) Except as otherwise provided in § 4–305 of the Correctional Services Article, the person is not eligible for parole during the mandatory minimum sentence.

(3) At the time of the commission of the offense, if a period of more than 5 years has elapsed since the person completed serving the sentence for the most recent conviction under paragraph (1)(i) or (ii)

The Petitioner, Rodney Taureen Moore, after entering into an agreed statement of facts, was convicted of illegal possession of a regulated firearm in the Circuit Court for Baltimore County and sentenced to five years' imprisonment without possibility of parole. Moore appealed to the Court of Special Appeals, which affirmed his conviction in a reported opinion, *Moore v. State*, 189 Md.App. 90, 983 A.2d 583 (2009), and we granted his Petition for a Writ of Certiorari, 412 Md. 689, 990 A.2d 1046 (2010), to address the following questions:

1. Is proof of the operability of the firearm a prerequisite to a conviction for illegal possession of a regulated firearm [under Section 5–133 of the Public Safety Article, Maryland Code (2003) ]?

2. If so, was the evidence insufficient to prove operability in the present case? [3]

Although the handgun in question could certainly have qualified as operable,[4] for the purposes of our opinion, we shall assume it was not and shall hold that a firearm, as it is defined in Section 5–101(h), does not have to be operable in order to sustain a conviction under Section 5–133(c), which prohibits a person convicted of a crime of violence or offenses related to the sale and distribution of controlled dangerous substances

---

of this subsection, including all imprisonment, mandatory supervision, probation, and parole:
(i) the imposition of the mandatory minimum sentence is within the discretion of the court; and
(ii) the mandatory minimum sentence may not be imposed unless the State's Attorney notifies the person in writing at least 30 days before trial of the State's intention to seek the mandatory minimum sentence.
2011 Md. Laws, Chaps. 164, 165.

3. Because we conclude that proof of operability of the firearm is not a prerequisite to a conviction for illegal possession of a regulated firearm, we need not address the sufficiency issue raised in the second question presented.

4. In the agreed statement of facts, the State noted that, "[the forensic expert] would indicate, if he would not have fixed the handgun and test fired it, the *gun would have gone off*, but it could have exploded or the shell casing would have come back and hit him in the head, and that was reason for fixing the gun." (emphasis added).

from possessing a regulated firearm. Therefore, we affirm the judgment of the Court of Special Appeals.

## Background

In July 2007, a robbery and shooting took place that ultimately resulted in the execution of a search warrant at Rodney Taureen Moore's residence, during which a .32 caliber, Harrington and Richardson, Model II revolver was recovered from beneath his bed. Moore was indicted by a grand jury in the Circuit Court for Baltimore County, wherein it was alleged, *inter alia,* that he "did unlawfully possess, own, carry and transport a regulated firearm after having been convicted of an offense," based upon a conviction, in 2005, for possession of cocaine with intent to distribute, one of the enumerated offenses in Section 5–133(c)(1)(ii).[5]

Moore filed a motion *in limine* prior to trial, in which he asked the court to determine whether, as a matter of law, a conviction under Section 5–133(c) required proof of the operability of the firearm. In denying Moore's motion, the judge ultimately relied on the "plain and ordinary meaning of the definition" of firearm located in Section 5–101(h) and determined that, for a "conviction under Section 5–133 of the Public Safety Article, the handgun does not have to be operable."

Thereafter, after the State agreed to *nolle prosequi* the remaining counts in the Indictment upon a finding of guilt, Moore entered a not guilty plea on an agreed statement of facts directed at Count Nine, in which a violation of Section 5–133(c) was alleged. The State's Attorney proffered the agreed statement of facts:

---

**5.** Section 5–133(c)(1)(ii) prohibits a person from possessing a regulated firearm if the person was previously convicted of a "crime of violence" or "a violation of § 5–602, § 5–603, § 5–604, § 5–605, § 5–606, § 5–607, § 5–608, § 5–609, § 5–612, § 5–613, or § 5–614 of the Criminal Law Article." Section 5–602 *et seq.* of the Criminal Law Article pertains to crimes involving controlled dangerous substances and paraphernalia. On May 5, 2005, Moore had been convicted in the Circuit Court for Baltimore City of possession of cocaine with intent to distribute, a violation of Section 5–602 of the Criminal Law Article, Maryland Code (2002).

**124**

Your Honor, if the case were to have gone to trial, the [S]tate would have presented the following evidence: That is that, on July 5th, 2007, detectives from the violent crimes unit of the Baltimore County Police Department were called upon to investigate a robbery and shooting that occurred here in Baltimore County.

During the course of that investigation, two witnesses came forward with information at that time that implicated this defendant, Rodney Moore, as well as the co-defendants later also charged in this case. Those two witnesses came forward approximately two to three weeks after the actual robbery and shooting.

The information provided led to the detectives obtaining a lawful search and seizure warrant for the residence of this defendant, Rodney Moore. The detectives received information that the defendant, Rodney Moore, lived at the location, as well as his girlfriend and possibily one of the other co-defendants that was involved in the robbery.

\* \* \*

When the tactical squad entered, they found this defendant, Rodney Moore, and his girlfriend in bed in the master bedroom, and they also recovered a handgun that was under the bed where the defendant was sleeping. They described the gun as in close proximity to this defendant.

The gun recovered was a .32 caliber revolver, Harrington and Richardson, Model II. It was a hinge frame revolver. It did bear a proper serial number.

The detectives also recovered underneath the bed a shell casing, a fired casing and projectile. Both of those items were wrapped in a paper towel under the very same bed. Additionally, when the handgun was recovered, detectives checked it to make sure it was safe, and they did find that it had one loaded round in the cylinder. Those items were properly seized and packaged and sent to the lab for analysis additionally.

The State's Attorney then described the forensic examination that ensued after police recovered the gun:

The handgun had been sent for more forensic examination to the Baltimore County crime lab. Michael Thomas, a firearm examiner, did analyze both the handgun, as well as the fired casing and the fired projectile.

Mr. Thomas's findings, specifically with regard to the handgun, was that it was defective. Though defective, it was tested and found to fire. Mr. Thomas, for his own safety, replaced a latch on the handgun that was cracked in order to test fire the gun. Once he did so, it did. It was found to properly function and fire.

If Mr. Thomas were called to testify, he would be offered as an expert in forensic or in firearm identification. He would indicate that he, although defective, he did essentially fix the handgun for his own safety. He would indicate, if he would not have fixed the handgun and test fired it, the gun would have gone off, but it could have exploded or the shell casing could have come back and hit him in the head, and that was reason for fixing the gun, and that is for his own safety.

The State's Attorney described that, in 2005, Moore had been convicted of a disqualifying offense that prohibited him from possessing a regulated firearm:

Your honor, the defendant, on May 5th, 2005, was convicted of a crime which prohibits him from possessing a regulated firearm. As a indicated, he was convicted May 5, 2005, of possession with intent to distribute cocaine. He was convicted in Baltimore City, and his sentence was two years, suspend all but a month, probably a time served type of sentence.

He is prohibited from possessing a regulated firearm.

The State's Attorney, then, further described the weapon found beneath Moore's bed:

The .32 caliber revolver in this case is a regulated firearm. It is a handgun with a barrel less than 16 inches in length, and it expels—is designed to expel or may readily be converted to expel a projectile by action of an explosive, and at a minimum is certainly also a frame of such a weapon.

Following the State's proffer, Moore's counsel offered the following additions and modifications to the agreed statement of facts:

Your Honor, by way of additions or modifications, . . . that would have been testified to concerning the test firing of the gun, itself, the latch, itself, was repaired, actually replaced from another gun. It was taken from another gun and placed onto that gun.

Also defective in the gun was what is called a recoil cap, which is where the hammer engages the back of the shell. That was actually missing from the gun, which would cause one to fire the gun to have to clear the chamber and remove residue or bullet material that would be in there, in order to get the gun to fire again.

Also, what would have been testified to was that, when test firing the gun, the actual ammunition being used in the gun in its current state was .38 automatic ammunition, the problem being the gun, itself, was a revolver. So in order for it to test fire, the expert actually took a regular .38 Smith and Wesson casing made for the revolver and replaced it with an automatic bullet, making a new bullet to further ensure the safety of the test fire, itself.

So the only addition or modification placed on the record or that I would like placed on the record is that the gun, in the condition in which it was found, was never test fired. The testimony of the expert was that he believes it would have fired in some way. Whether the bullet went sideways, forward or backward is still open to conjecture.

Following the State's recitation and the proffered additions, Moore renewed his motion regarding the operability of the firearm, again arguing that Section 5–133(c) required proof of the operability of the firearm. The judge again denied Moore's motion, adopting the reasoning set forth in his previous ruling. Moore then moved for judgment of acquittal, which the judge also denied. Thereafter, Moore was found

guilty and sentenced to five years' imprisonment.[6]  Moore noted a timely appeal to the Court of Special Appeals.

Before the Court of Special Appeals, Moore argued that, under Section 5–133(c), the State must prove operability of the firearm in order to secure a conviction.  The Court of Special Appeals affirmed his conviction, however, determining that the Circuit Court Judge properly denied Moore's motion, because, based on the plain language of Section 5–101(h), "firearm" includes both operable and inoperable weapons.  *Moore v. State,* 189 Md.App. 90, 110, 983 A.2d 583, 595 (2009).  The intermediate appellate court further determined that the legislative history of Section 5–101(h) indicated that the Legislature clearly intended the definition of "firearm" to be consistent with the federal definition for "firearm," which was located in Section 921(a)(3), Title 18 of the United States Code, which also does not require operability.  *Id.* at 110, 983 A.2d at 595.

**Discussion**

The State and Moore both agree that the crux of this case is whether a handgun must be operable to be considered a "firearm" under Section 5–101(h) of the Public Safety Article;  they disagree as to whether that Section requires operability.  We are thus presented with an issue of statutory interpretation, the well-settled principles of which we recently observed in *Ray v. State,* 410 Md. 384, 978 A.2d 736 (2009):

> In statutory interpretation, our primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules.  We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.  If the language of the statute is clear and unambiguous, we need

---

**6.**  Section 5–133(c)(2) provides: "A person who violates this subsection is guilty of a felony and on conviction is subject to imprisonment for not less than 5 years, no part of which may be suspended."

not look beyond the statute's provisions and our analysis ends. Occasionally we see fit to examine extrinsic sources of legislative intent merely as a check of our reading of a statute's plain language. In such instances, we may find useful the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments.

If, however, the language is subject to more than one interpretation, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute. When the statute is part of a larger statutory scheme, it is axiomatic that the language of a provision is not interpreted in isolation; rather, we analyze the statutory scheme as a whole considering the purpose, aim, or policy of the enacting body and attempt to harmonize provisions dealing with the same subject so that each may be given effect.

*Id.* at 404–05, 978 A.2d at 747–48 (internal citations and quotation marks omitted).

Section 5–101(h) of the Public Safety Article defines a "firearm" as follows:

(h) *Firearm.* (1) "Firearm" means:

(i) a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; or

(ii) the frame or receiver of such a weapon.

(2) "Firearm" includes a starter gun.

Moore argues that Section 5–101(h) is ambiguous and incapable of plain meaning analysis, because our jurisprudence "on the requirement of operability in [other] firearm offenses makes the meaning of the definition of 'firearm' far from 'plain.'" Moore further contends that the legislative history of Section 5–101(h) contains no indication that the Legislature intended for the definition of firearm to include inoperable weapons. Conversely, the State argues that there is no requirement that a regulated firearm must be operable, a conclusion, according to the State, that "is clearly borne out by

both the statute's plain language, its legislative history, and the policy behind this history."

In the present case, the Court of Special Appeals consulted dictionary definitions to conduct its plain meaning analysis of Section 5–101(h), concluding that the definition of "firearm" includes inoperable weapons. *Moore,* 189 Md.App. at 110, 983 A.2d at 595. It bolstered that analysis by delving into the legislative history of the statute and the case law interpreting its federal analogue. *Id.* at 102–05, 983 A.2d at 590–92. We shall follow a similar path in our exploration of whether plain meaning analysis controls.

Initially, we would observe that there is no language in Section 5–101(h) that requires operability. Although Moore would have us insert an operability requirement in Section 5–101(h), we have frequently stated that "[w]e will not ... judicially insert language [into a statute] to impose exceptions, limitations, or restrictions not set forth by the legislature." *Henriquez v. Henriquez,* 413 Md. 287, 299, 992 A.2d 446, 454 (2010), quoting *St. Joseph Medical Center, Inc. v. Cardiac Surgery Associates, P.A.,* 392 Md. 75, 95, 896 A.2d 304, 316 (2006) (citations and internal quotation marks omitted) (alterations in original); *see also Nesbit v. Government Employees Insurance Co.,* 382 Md. 65, 75, 854 A.2d 879, 885 (2004) ("We will not divine a legislative intention contrary to the plain language of a statute or judicially insert language to impose exceptions, limitations or restrictions not set forth by the legislature." (citations and internal quotation marks omitted)); *Melton v. State,* 379 Md. 471, 477, 842 A.2d 743, 746 (2004) ("[W]e will not add or delete words from the statute.").

When conducting a plain meaning analysis, we have observed that dictionary definitions "provide a useful starting point for discerning what the legislature could have meant in using a particular term." *Ishola v. State,* 404 Md. 155, 161, 945 A.2d 1273, 1276 (2008), quoting *Stachowski v. Sysco Food Services of Baltimore, Inc.,* 402 Md. 506, 525–26, 937 A.2d 195, 206 (2007). Section 5–101(h)(1)(i) states that a "firearm" means "a weapon that expels, is designed to expel, or may

readily be converted to expel a projectile by the action of an explosive." This part of the statute contemplates three distinct levels of functionality under which a firearm may fall: the first is "a weapon that expels ... a projectile by the action of an explosive." The word "expel" means "to force out," Merriam–Webster's Collegiate Dictionary 440 (11th ed.2005) (hereinafter "Webster's"), or "to discharge from or as if from a receptacle," The American Heritage Dictionary 625 (4th ed.2006) (hereinafter "American Heritage"). In addition, this portion of Section 5–101(h)(1)(i) uses the word "expel" in the present tense, indicating that a firearm includes a weapon that can *presently* "force out" or "discharge" a projectile by the action of an explosive. The plain meaning of "a weapon that expels" thus leads to the determination that Section 5–101(h)(1)(i) clearly includes weapons that are presently operable, a conclusion that neither party challenges.

Secondly, the Section also provides that a firearm may be a weapon that "is designed to expel ... a projectile by the action of an explosive." The word "design" is defined as "[t]o create or contrive for a particular purpose or effect," American Heritage, *supra*, at 491, or "to devise for a specific function or end," Webster's, *supra*, at 338. In other words, a firearm may be a weapon that is "created," "contrived" or "devised" for the "specific function" or "particular purpose" to "force out" or "discharge" a projectile by the action of an explosive, although not functional. This portion clearly includes inoperable, albeit designed to be operable, firearms. *See Neal v. State,* 191 Md.App. 297, 308, 991 A.2d 159, 165 (2010) ("[T]he design and construction of a weapon, rather than the state of its operability at the time of the crime, determines whether a weapon is or is not a 'firearm' for the purposes of § 5–101 and 5–133 of the Public Safety Article.").

Thirdly, under Section 5–101(h)(1)(i), a "firearm" also includes a weapon that "may readily be converted to expel a projectile by the action of an explosive." The word "readily" means "without much difficulty," Webster's, *supra*, at 1035, "[i]n a prompt, timely manner," or "[i]n a manner indicating or connoting ease." American Heritage, *supra*, at 1455. The

word "convert," in turn, means "to change from one form or function to another," "to alter the physical or chemical nature or properties of," Webster's, *supra*, at 273, "[t]o change (something) into another form, substance, state, or product," or "[t]o change (something) from one use, function, or purpose to another." American Heritage, *supra*, at 401. A "firearm," as it is contemplated in this portion of Section 5–101(h)(1)(i), thus includes a weapon that may be "changed" or "altered" "in a prompt, timely manner," from one that cannot "expel a projectile by the action of an explosive," i.e., an inoperable weapon, to one that can "expel a projectile by the action of an explosive." This portion of the statute, thereby, also clearly contemplates that a firearm may be inoperable, although readily converted.

Our plain meaning analysis is further bolstered by the terms of the second portion of the statute in issue, Section 5–101(h)(1)(ii), which states that a "firearm" may be "the frame or receiver of such a weapon." While "frame or receiver" is not defined, the Bureau of Alcohol, Tobacco, and Firearms, the federal law enforcement agency tasked with investigating, *inter alia,* crimes involving the unlawful use, manufacture, and possession of firearms, defines a "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11. A frame or receiver that provides housing for the internal components of the weapon is clearly not capable of "expel[ling] a projectile by the action of an explosive," absent the requisite internal components. Thus, Section 5–101(h)(1)(ii), which defines "firearm" as including the "frame or receiver," only a component, clearly does not require operability of the weapon for its application. *See Hicks v. State,* 189 Md.App. 112, 136, 984 A.2d 246, 260 (2009) ("The 'frame or receiver' of a firearm is not, in and of itself, an operable firearm as it is not capable of expelling a projectile by the action of an explosive. This leads to the inference that, when the General Assembly enacted the statutory predecessor to

Pub. Safety § 5–133, it did not intend to restrict the definition of the term 'firearm' to operable weapons.").

Our interpretation of the plain meaning of the definition of "firearm" as including inoperable weapons finds succor in the legislative history of Section 5–101. It appears that Section 5–101 was first enacted in 1941, when the General Assembly added Section 531B to Article 27, Maryland Code (1939), under the subtitle "Pistols." 1941 Md. Laws, Chap. 622 (codified at Maryland Code (1939, 1947 Supp.), Section 531B of Article 27). At the time, the statute did not define "firearm," only defining "pistol or revolver" as "any firearm with barrel less than twelve inches in length." *Id.*

In the 1951 Codification of the Maryland Code, Section 531B was renumbered as Section 538, without change, and then again in the 1957 Codification of the Maryland Code, as Section 441, again without change. In 1966, Section 441 was repealed and re-enacted, with amendments. 1966 Md. Laws, Chap. 502 (codified at Maryland Code (1957, 1967 Supp.), Section 441 of Article 27). The definition for "pistol or revolver" was expanded to include "any firearm with barrel less than twelve inches in length, including signal, starter, and blank pistols." *Id.* In 1979, Section 441 was amended again, "[f]or the purpose of defining the term 'antique pistol or revolver' to mean a pistol or revolver manufactured before a certain date. . . ." 1979 Md. Laws, Chap. 471. From this point until 1996, there were no substantive changes to Section 441 that pertained to pistols or revolvers.

In the 1996 Legislative Session, the General Assembly passed the Maryland Gun Violence Act of 1996. 1996 Maryland Laws, Chs. 561, 562. The Bill, which included House and Senate versions, House Bill 297 and Senate Bill 215, respectively, was summarized as follows:

This bill is aimed at reducing gun-related violent crime in Maryland with a two-fold approach.

First, the bill creates several new crimes involving the use or possession of firearms, increases the penalties for several current crimes relating to the use or possession of firearms,

and authorizes the courts and law enforcement authorities to take certain action regarding firearms in domestic violence situations.

Second, the bill makes several substantive, as well as nonsubstantive, changes to the current law governing the sale, transfer, and possession of pistols, revolvers, and assault weapons (all included in the new term "regulated firearms" in the bill).

House Judiciary Committee Bill Analysis for Senate Bill 215, at 1 (1996). The Bill substantially amended Section 441 of Article 27, removing the definition of "pistol or revolver" and adding several new definitions, including "firearm," "handgun" and "regulated firearm," which the Senate Judicial Proceedings Committee described as follows:

(viii) Firearm: This is a new term that is defined to mean any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive or the frame or receiver or any such weapon.

*    *    *

(xiii) Handgun: This term is a substitute for the terms "pistol" and "revolver." However, the definition of this term is broader than the current definition of the terms "pistol" and "revolver" because it includes any firearm with a barrel of less than 16 inches," rather than 12 inches as specified in current law.

*    *    *

(xv) Regulated Firearm: This is a new term that includes; (1) handguns; (2) assault weapons; and (3) any firearm whose sale or transfer is subject to the provisions of the new subtitle governing the sale and repair of regulated firearms.

Senate Judicial Proceedings Committee Bill Analysis for Senate Bill 215, at 4 (1996). With the passage of the Maryland Gun Violence Act, the definition of "firearm" was eventually codified in Section 441(i) of Article 27, Maryland Code (1957, 1996 Repl. Vol.), as:

(1) Any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; or

(2) The frame or receiver of any such weapon.

Finally, in 2003, the General Assembly repealed Section 441, recodifying it in the newly-created Public Safety Article at Section 5–101, without substantive change, where it is currently located. 2003 Md. Laws, Chap. 5 (codified at Maryland Code (2003), Section 5–101 of the Public Safety Article).[7]

■ The basis for the change was to further prevent weapons from being possessed by individuals who should not hold them, pursuant to Section 5–133, which prohibits possession of firearms by felons convicted of crimes of violence or enumerated drug crimes. In so doing, the Legislature chose to follow the federal model. According to the Senate Floor Report for

---

7. Moore contends that "[i]t would be unreasonable to conclude that, when the Legislature made an *explicit* change to the existing law of operability in one statute, it also *implicitly* eliminated the requirement of operability with respect to other firearms offenses as well." This argument apparently focuses on the fact that, in 1996, the General Assembly also amended former Section 36B(d) of Article 27, the provision pertaining to the "unlawful use of [a] handgun or antique firearm in [the] commission of crime," adding the following language: "whether operable or inoperable at the time of the offense." 1996 Md. Laws, Chs. 561, 562. According to Moore, under the doctrine of *expressio unius est exclusio alterius*, or, "the expression of one thing is the exclusion of another," *Walzer v. Osborne*, 395 Md. 563, 579, 911 A.2d 427, 436 (2006), the failure of the Legislature to add the same language to Section 441(i) indicated the intent to require operability in that statute and in its current iteration, Section 5–101(h). To apply Moore's reasoning, however, we would have to assume that the Legislature's failure to include in Section 441(i) the language, "whether operable or inoperable," indicated its intent to exclude inoperable and operable weapons from the statute. This would leave us with an absurd result, as a weapon that is neither operable or inoperable is a nullity.

The doctrine of *expressio unius est exclusio alterius*, moreover, is "merely an auxiliary rule of statutory construction applied to assist in determining the intention of the Legislature where such intention is not manifest from the language used." *Walzer*, 395 Md. at 579, 911 A.2d at 436, quoting *Hylton v. Mayor and City Council of Baltimore*, 268 Md. 266, 282, 300 A.2d 656, 664 (1972). The Legislature clearly intended to include inoperable and operable weapons within the purview of Section 5–101.

the 1996 Bill, the definition that the General Assembly chose for "firearm" was a "[n]ew definition consistent with federal law." [8]   Senate Judicial Proceedings Committee Floor Report for Senate Bill 215, at 6 (1996).   At the time of the 1996 enactment (and currently), the federal definition of "firearm" was located in Section 921(a)(3) of Title 18, United States Code and contained nearly-identical language to the definition for "firearm" located in Section 441(i) of Article 27, Maryland Code (1957, 1996 Repl.Vol.), providing:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device.   Such term does not include an antique firearm.

This Section was enacted in 1968 as part of the Omnibus Crime Control and Safe Streets Act of 1968.   Pub.L. No. 90–351, 82 Stat. 237 (1968).   The Senate Report for the Bill iterated that inoperable firearms were swept up in the term, "firearm":

> Section 921(a)(3).-This definition of the term "firearm" is a revision of the definition in the present law (15 U.S.C. 901(3)).   The definition has been extended to include any weapon (including a starter gun) which will, or may be readily converted to, expel a projectile or projectiles by the action of an explosive. *This provision makes it clear that so-called unserviceable firearms come within the definition.* Under the present definition of "firearm," any part or parts of such a weapon are included.   It has been found that it is impractical to have controls over each small part of a firearm.   Thus, the revised definition substitutes only the

---

8.   To the extent that Moore contends that the new definition was not consistent with federal law, we find no merit in his argument.   In addition to the legislative history that indicates as much, the definition that the General Assembly chose for the definition of "firearm" was virtually identical to language that was found in Section 921(a)(3) of Title 18, United States Code.

major parts of the firearm; that is, frame or receiver for the words "any part or parts."

S.Rep. No. 90–1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2200 (emphasis added). As a result, plain meaning analysis, as well as legislative history in the State and for that of our federal analogue, leads us to conclude that a weapon does not have to be operable to come within the definition of "firearm" in Section 5–101(h). *See Nash v. State,* 191 Md.App. 386, 405 n. 8, 991 A.2d 831, 842 n. 8 (2010) (noting that "the State is not required to demonstrate that a firearm is operable to obtain a conviction under [Section] 5–133(c)").

We would be remiss if we did not note that federal courts have overwhelmingly determined that operability is not a requirement under the similar federal statute, Section 921(a)(3) of Title 18, United States Code. *See, e.g., United States v. Williams,* 577 F.3d 878, 882 (8th Cir.2009) ("We have repeatedly rejected the contention that a firearm needs to be operable in order to support a conviction. . . ."); *United States v. Abdul–Aziz,* 486 F.3d 471, 477 (8th Cir.2007) ("[Section] 921(a)(3) does not necessarily require that a rifle be operable to be considered a firearm."); *United States v. Gwyn,* 481 F.3d 849, 855 (D.C.Cir.2007) ("We too agree that 18 U.S.C. § 921(a)(3) includes 'inoperable weapons' within the definition of 'firearm.' "); *United States v. Williams,* 445 F.3d 724, 732 n. 3 (4th Cir.2006) ("[Section] 921(a)(3) does not require that the firearm be operable when the defendant possessed it."); *United States v. Adams,* 137 F.3d 1298, 1300 (11th Cir.1998) ("Nothing in either § 922(g)(1) or § 921(a)(3) requires the government to show that the unlawfully possessed firearm is operable."); *United States v. Hunter,* 101 F.3d 82, 85 (9th Cir.1996) ("[u]nder 18 U.S.C. § 921(a)(3), the term 'firearm' includes mere parts of a gun which alone are incapable of firing, such as the frame"); *United States v. Maddix,* 96 F.3d 311, 316 (8th Cir.1996) (fact that firearm "could not be loaded without using certain tools" not a bar to conviction for being a felon in possession of a firearm); *United States v. Yannott,* 42 F.3d 999, 1006 (6th Cir.1994) ("[T]he law is clear that a weapon does not need to be operable to be a firearm."), *cert.*

*denied,* 513 U.S. 1182, 115 S.Ct. 1172, 130 L.Ed.2d 1125 (1995); *United States v. Willis,* 992 F.2d 489, 491 n. 2 (4th Cir.1993) (noting that "that there is no requirement that a firearm be operable in order to satisfy the definition contained in § 921(a)(3)"); *United States v. York,* 830 F.2d 885, 891 (8th Cir.1987) ("Section 921(a)(3) [defining 'firearm'] does not require a firearm to be operable."); *United States v. Harris,* 792 F.2d 866, 868 (9th Cir.1986) ("Section 921(a)(3) defines 'firearm' to include 'any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive, as well as the frame or receiver of such a weapon.' It does not require a weapon be operable."); *United States v. Goodheim,* 686 F.2d 776, 778 (9th Cir.1982) ("The statutory language defining 'firearm' . . . does not require that the weapon be operable."). *See also Office of the State Prosecutor v. Judicial Watch, Inc.,* 356 Md. 118, 138, 737 A.2d 592, 603 (1999) (after observing that the Maryland Public Information Act was "virtually identical" to the earlier enacted federal Freedom Of Information Act, noting that, "[w]here the purpose and language of a federal statute are substantially the same as that of a later state statute, interpretations of the federal statute are ordinarily persuasive" (quoting *Faulk v. State's Attorney for Harford County,* 299 Md. 493, 506, 474 A.2d 880, 887 (1984))).

Moore urges us, nevertheless, to ignore the plain meaning of Section 5–101(h) and, instead, rely on *Howell v. State,* 278 Md. 389, 364 A.2d 797 (1976), which interpreted a different handgun statute. In *Howell,* we considered whether a tear gas gun was a handgun within the meaning of Section 36F(b) of Article 27, Maryland Code (1957, 1976 Repl.Vol.),[9] which defined a handgun as follows:

(b) Handgun.—"Handgun" means any pistol, revolver, or other firearm capable of being concealed on the person, including a short-barreled shotgun and a short-barreled rifle as these terms are defined below, except it does not include

---

9. In 2002, Section 36F(b) was repealed and recodified in the Criminal Law Article. 2002 Md. Laws, Chap. 26. It is now located in Section 4–201(c) of the Criminal Law Article, Maryland Code (2002).

a shotgun, rifle, or antique firearm as those terms are defined below.

This definition pertained to offenses for wearing and carrying handguns during the commission of certain crimes, which were enumerated in Section 36 of Article 27. In attempting to discern the class of weapons that qualified as handguns under Section 36, in *Howell*, we observed, in a footnote:

> The Attorney General in 58 Op. Att'y Gen. 572, 576 (1973) opined that "[i]t is abundantly clear that the term handgun as defined [in the Maryland statute] covers the same weapons as contemplated in the definition of firearm contained in the 'Gun Control Act of 1968,' codified at 18. U.S.C. 921(3)," stating that the latter statute "defines a firearm as '. . . any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.' "
>
> *       *       *
>
> It is to be specifically noted that the Maryland statute does not define the term "firearm."

*Howell*, 278 Md. at 391–92 n. 1, 364 A.2d at 798–99 n. 1. Determining that a tear gas gun was not a handgun, we concluded:

> [F]or this device to be a handgun it must be a firearm or it must be readily or easily convertible into a firearm. We further conclude that to be a firearm it must propel a missile by gunpowder or some such similar explosive and that the gas here involved is not a missile within the natural and ordinary signification of the term.

*Id.* at 396, 364 A.2d at 801.

Our colleagues on the Court of Special Appeals have apparently relied on *Howell* as prescribing an operability requirement, not only in *use* of a handgun cases, but also in the carrying of a handgun context. In this regard, *York v. State*, 56 Md.App. 222, 467 A.2d 552 (1983), involving the use of a handgun, clearly necessitated operability for a conviction after

*Howell.* To the extent that, in *Brown v. State,* 182 Md.App. 138, 167 n. 16, 957 A.2d 654, 670 n. 16 (2008), in dicta, in a footnote, our colleagues noted that operability was a requirement for carrying offenses,[10] we need not express any opinion, because the statutory definition of "handgun" is different in 4–201 of the Criminal Law Article than the definition for "firearm" in Section 5–101 of the Public Safety Article.

Moore contends that *Howell* and, specifically, our interpretation of the meaning of "firearm" as mandating some level of operability, requires us to find that a "firearm" under Section 5–101(h) must also achieve that level of operability. Our discussion in *Howell,* however, does not alter our interpretation of the plain meaning of Section 5–101(h) as not requiring operability. Moore's reliance on *Howell* fails to give proper credence to the axiom that the same word or phrase in two different statutes can nonetheless contain different meanings:

> There is no rule of construction which requires the same meaning always to be given to the same word, when used in different connections in the same statute or in different statutes. On the contrary, such is the flexibility of language and the want of fixity in many of our commonest expressions, that a word or phrase may bear very different meanings according to the connection in which it is found. Hence the rule that the terms of a statute are always to be interpreted with references to the subject-matter of the enactment.

Henry C. Black, Handbook on the Construction and Interpretation of the Laws 171–72 (2d ed.1911). *See also Price v. State,* 378 Md. 378, 388, 835 A.2d 1221, 1227 (2003) ("We do not read the statute divorced from its textual context, for 'adherence to the meaning of words does not require or permit isolation of words from their context.' " (quoting *Maguire v. State,* 192 Md. 615, 623, 65 A.2d 299, 302 (1949))). Two differing levels of operability regarding handguns and firearms can, thus, coexist.

---

**10.** See also, in this regard, *Powell v. State,* 140 Md.App. 479, 780 A.2d 1219 (2001), and *Wright v. State,* 70 Md.App. 616, 522 A.2d 401 (1987).

The Court of Special Appeals has had occasion to observe the differing contexts under which these two definitions apply. In *York v. State,* 56 Md.App. 222, 467 A.2d 552 (1983), the intermediate appellate court observed why, under Section 36 of Article 27, the *use* of the handgun implicitly required the *operability* of the handgun, as we had recognized in *Howell:*

> The General Assembly included a declaration of policy when it enacted Art. 27, § 36B. After finding that "in recent years [there has] been an alarming increase in the number of violent crimes perpetrated in Maryland, and a high percentage of those crimes involve the use of handguns" (Art. 27, § 36B(a)(i)), the [L]egislature went on to explain:
>
>> (ii) The result has been a substantial increase in the number of persons killed or injured which is traceable, in large part, to the carrying of handguns on the streets and public ways by persons inclined to use them in criminal activity. . . .
>
> This language demonstrates that the paramount purpose of the General Assembly in enacting § 36B was to reduce the especially high potential for death or serious injury that arises when a handgun, as distinguished from some other weapon, is used in a crime of violence. That potential for major harm exists only when the weapon, at the time of the offense, is useable as a handgun. If it is not then so useable, its likelihood of inflicting injury is no greater than that produced by a knife or a club—bad enough, but different from the special hazard to the victim that the legislature attached to the use of handguns.

*Id.* at 228–29, 467 A.2d at 555–56. In *Tisdale v. State,* 30 Md.App. 334, 343, 353 A.2d 653, 659 (1976), on the other hand, our intermediate appellate court determined that the definitions contained in the previous iteration of Section 5–101, Section 441, did not pertain to Section 36 handgun offenses, because "[d]ifferent offenses [we]re involved," as Section 441 and its corresponding provisions pertained to, *inter alia,* the possession of firearms, "thus possess[ing] an altogether different objective from the handgun law [housed in Section 36]."

In conclusion, the firearm in the present case did not need to be operable to constitute a violation of the statute in issue; therefore, Moore's conviction is affirmed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

BELL, C.J., and GREENE, J., Dissent.

BELL, C.J., dissenting, in which GREENE, J. joins.

The majority, relying on the plain language of Maryland Code (2003, 2011 Supp.) § 5–133(c) of the Public Safety Article,[1] the statute at issue, proscribing possession of a regulated firearm by a disqualified person, concludes that a handgun need not be operable to be considered a "firearm," as defined

---

1. Public Safety Article § 5–133(c) provides:
    *"(c) Penalty for possession by person convicted of crime of violence.—*
    "(1) A person may not possess a regulated firearm if the person was previously convicted of:
     "(i) a crime of violence; or
     "(ii) a violation of § 5–602, § 5–603, § 5–604, § 5–605, § 5–612, § 5–613, or § 5–614 of the Criminal Law Article.
    "(2)(i) Subject to paragraph (3) of this subsection, a person who violates this subsection is guilty of a felony and on conviction is subject to imprisonment for not less than 5 years and not exceeding 15 years.
     "(ii) The court may not suspend any part of the mandatory minimum sentence of 5 years.
     "(iii) Except as otherwise provided in § 4–305 of the Correctional Services Article, the person is not eligible for parole during the mandatory minimum sentence.
    "(3) At the time of the commission of the offense, if a period of more than 5 years has elapsed since the person completed serving the sentence for the most recent conviction under paragraph (1)(i) or (ii) of this subsection, including all imprisonment, mandatory supervision, probation, and parole:
     "(i) the imposition of the mandatory minimum sentence is within the discretion of the court; and
     "(ii) the mandatory minimum sentence may not be imposed unless the State's Attorney notifies the person in writing at least 30 days before trial of the State's intention to seek the mandatory minimum sentence.
    "(4) Each violation of this subsection is a separate crime."

in § 5–101(h)[2] of that Article. The majority, in so concluding, assumes a fact that simply does not exist, that there is a uniform definition of firearm, which applies to the construction of § 5–133(c). There are, however, conflicting definitions of the term, "firearm," one of which the majority fails to address, either ignoring it or paying it short shrift. To be sure, "firearm" is defined by § 5–101(h) in a way that supports the majority's interpretation of § 5–133(c), and that would be dispositive, except that, prior to its enactment, this Court had defined firearm differently, *albeit* in construing a different statute and in a different context. Notwithstanding that one of the definitions was developed by case law in connection with a different statute and if it were confined only to that statute, the other definition, the one reflected in the statutory language, may be clear, where there is more than one definition of a term and those definitions are conflicting, an ambiguity exists, as it calls into question the Legislature's intention in enacting the statute; given the conflicting definition that the legislation contained, it is not at all clear that the General Assembly intended to overrule this Court's earlier definition of firearm. Thus, the plain language of § 5–101(h) no longer governs its meaning. For this reason, I respectfully dissent.

The petitioner, Rodney Taureen Moore, was charged in Baltimore County, with, *inter alia,* two counts of the use of a handgun in the commission of a crime of violence, Maryland Code (2002) Criminal Law Article § 4–204(a),[3] wearing, carrying or transporting a handgun, Criminal Law Article § 4–

---

2. Public Safety Article § 5–101(n) also contains a definition of "handgun," "a firearm with a barrel less than 16 inches in length[, including] signal, starter, and blank pistols," a carry-over from former Maryland Code (1957, 1996 Repl.Vol.) Article 27, § 441(c). Although not as forthright as Public Safety Article §§ 5–301 and 5–401, both of which defined handguns by reference to the definition in Maryland Code (2002, 2011 Supp.) Criminal Law Article, § 4–201, this seems to be for a similar purpose, to conform to that aspect of the Criminal Law Article definition that addresses concealability.

3. Criminal Law Article § 4–204(a) (2002) provides:
    "(a) *Prohibited.*—A person may not use a firearm in the commission of a crime of violence, as defined in § 5–101 of the Public Safety

203(a),[4] as well as a Maryland Code (2003) Public Safety Article, § 5–133(c) violation, possession of a firearm by a convicted felon. After a court trial, the petitioner was convicted of the § 5–133(c) charge, and sentenced to five years imprisonment, without parole.[5] That charge, felon in possession, stemmed from the petitioner's 2005 conviction of possession of cocaine with intent to distribute, one of the enumerated proscribed offenses in § 5–133(c)(1)(ii), and the recovery of a .32 caliber revolver from beneath the petitioner's bed during the execution of the search warrant at his residence. The handgun, the forensic firearms examiner concluded, was defective. In order to safely test-fire the gun, he had to replace a latch, that was cracked, on the gun. For the purposes of this opinion, therefore, the handgun, when discovered, was defective and inoperable.

Under the Maryland statutory scheme regarding gun crimes, it was, as it is now, a crime to wear, carry and

---

Article, or any felony, whether the firearm is operable or inoperable at the time of the crime."

**4.** Criminal Law Article § 4–203(a) (2002) provides:

"(a) *Prohibited.—*

"(1) Except as provided in subsection (b) of this section, a person may not:

"(i) wear, carry, or transport a handgun, whether concealed or open, on or about the person;

"(ii) wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State;

"(iii) violate item (i) or (ii) of this paragraph while on public school property in the State; or

"(iv) violate item (i) or (ii) of this paragraph with the deliberate purpose of injuring or killing another person.

"(2) There is a rebuttable presumption that a person who transports a handgun under paragraph (1)(ii) of this subsection transports the handgun knowingly."

**5.** All other charges were *nolle prosequi'd* after the trial judge, in a ruling on a motion *in limine*, found as a matter of law, that a handgun need not be operable for a conviction under § 5–133(c). Thereafter, the parties proceeded on a not guilty agreed statement of facts, at which the State pursued only the charge under § 5–133(c) of the Public Safety Article.

transport a handgun, Maryland Code (1957, 1996 Repl.Vol.) Article 27, § 36B (b) [6], now Maryland Code (2002, 2011 Supp.) Criminal Law Article, § 4–203, to use a handgun in the commission of a felony or crime of violence, Article 27 § 36B (d),[7] now § 4–204 of the Criminal Law Article, and for certain persons to possess "pistols and revolvers." Maryland Code (1957, 1971 Repl.Vol.) Article 27, § 445,[8] now § 5–133(b) of the Public Safety Article. Although Article 27, § 36F defined "handgun" as "any pistol, revolver, or other *firearm* capable of being concealed on the person ..." (emphasis added) [9] and the

---

6. Article 27, § 36B (b) provided:

"(b) *Unlawful wearing, carrying, or transporting of handguns; penalties.*—Any person who shall wear, carry, or transport any handgun, whether concealed or open, upon or about his person, and any person who shall wear, carry or knowingly transport any handgun, whether concealed or open, in any vehicle traveling upon the public roads, highways, waterways, or airways or upon roads or parking lots generally used by the public in this State shall be guilty of a misdemeanor; and it shall be a rebuttable presumption that the person is knowingly transporting the handgun."

All future references to Article 27 shall be to this volume of the Code, unless otherwise indicated.

7. Article 27, § 36B (d) provided:

"(d) *Unlawful use of handgun or antique firearm in commission of crime; penalties.*—Any person who shall use a handgun or an antique firearm capable of being concealed on the person in the commission of any felony or any crime of violence as defined in § 441 of this article shall be guilty of a separate misdemeanor and on conviction thereof shall, in addition to any other sentence imposed by virtue of commission of said felony or misdemeanor."

8. Maryland Code (1957, 1971 Repl.Vol.) Article 27, § 445, as relevant, provided:

"*Restrictions on sale, transfer and possession of pistols and revolvers.*
\*      \*      \*

"(c) Possession by criminal, fugitive, etc.—It shall be unlawful for any person who has been convicted of a crime of violence, or of any of the provisions of this subtitle or who is a fugitive from justice or a habitual drunkard, or addicted to or an habitual user of narcotics, barbiturates or amphetamines, to possess a pistol or revolver."

9. In its entirety, the definition was:

"(b) Handgun.—'Handgun' means any pistol, revolver, or other firearm capable of being concealed on the person, including a short-barreled shotgun and a short-barreled rifle as these terms are defined

Legislature defined, Article 27, § 441(c), "pistol or revolver" as "any firearm with barrel less than twelve inches in length, including signal, starter, and blank pistols," there were no provisions in Article 27 expressly regulating "Firearms," [10] or defining what a "firearm" was.

The scheme now in effect defines "firearm" as

"(i) a weapon that expels, is designed to expel, or may readily be converted to expel a projectile . . . or

"(ii) the frame or receiver of such a weapon."

Maryland Code (2003, 2011 Supp.) Public Safety Article, § 5–101(h).[11] That section includes in the definition "a starter gun."

As we have seen, that has not always been the case. This definition, in its present formulation, became a part of the Maryland legislative framework in 1996, when, as part of the Maryland Gun Violence Act of 1996, "Section 2, chs. 561 and 562, Acts 1996, effective Oct. 1, 1996, repealed former § 441 and enacted a new section in lieu thereof." That new § 441 contained new subsection (i), which provided:

"Firearm.—'Firearm' means:

"(1) Any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; or

"(1) The frame or receiver of any such weapon."

In another part of that Act, the General Assembly made a substantive change, and a significant one, to Article 27, § 36B (d). In what could only be an attempt, with respect to that

---

below, except it does not include a shotgun, rifle or antique firearm as those terms are defined below.' "

**10.** The one section under "Firearms," § 154, was repealed by Acts 1973, 1st Sp. Sess., ch. 4, § 2. It formerly stated:

*"Carrying firearm while under influence of alcohol or narcotic drug.* It shall be unlawful for a person to carry any firearm for the purpose of hunting any wild game, bird or creature, while intoxicated or under the influence of alcohol or any narcotic drug . . ."
Maryland Code (1957, 1971 Repl.Vol.) Article 27, § 154.

**11.** As a result of Code Revision, see laws 2003, ch.5, § 2, Article 27, § 441(i) was re-codified as § 5–101(h) of the Public Safety Article.

statute, to put to rest the controversy caused by certain factual scenarios involving obvious, but inoperable, handguns, the Legislature amended that section to provide:

"(d) *Unlawful use of handgun or antique firearm in commission of crime; penalties.*—Any person who shall use a handgun or an antique firearm capable of being concealed on the person in the commission of any felony or any crime of violence as defined in § 441 of this article, *whether operable or inoperable at the time of the offense,* shall be guilty of a separate misdemeanor. . . . "

(Emphasis added). Significantly, neither § 445, predecessor to § 5–133 of the Public Safety Article nor § 36B (b), predecessor to § 4–203 of the Criminal Law Article were amended to address operability.

Before *Howell v. State,* 278 Md. 389, 364 A.2d 797 (1976), as the majority states, § 441, the eventual predecessor to § 5–101, was titled "Pistols," and it contained no possession provisions—the possession prohibitions were in § 445, titled "Restrictions on sale, transfer and possession of pistols and revolvers," *see* note 9, *supra*—, although it enumerated the crimes that were predicate for the use of handgun charges proscribed by Article 27, § 36B (d). Additionally, § 447, titled "Antique or unserviceable firearms excepted," stated, "[t]he provisions of this subtitle shall not be construed to include any antique or unserviceable firearms sold or transferred and/or held as curios or museum pieces." Maryland Code (1957, 1971 Repl.Vol.) Article 27, § 447. Later, § 447, re-codified in 2003, *see* Laws 2003, ch. 5, § 2, without substantive change, as § 5–102 of the Public Safety Article, added the exception, "a regulated firearm modified to render it permanently inoperative[.]" Most significantly, there was not, in § 36B (b), (d) or any other statute, any exception or any attempt to exempt any weapon or device from the definition of handgun.

Subsequent to the passage of Maryland's Gun Violence Act of 1996, pursuant to Laws 2002, ch. 26, § 2, § 36F was re-

codified, without substantive change, as § 4–201(c) [12] of the Criminal Law Article. At the same time and by the same authority, the related provisions, § 36B (a), which prohibited the wearing, carrying or transporting of a handgun, and § 36B (d), which prohibited the use of a handgun or antique firearm in commission of a crime, were also re-codified as, respectively, § § 4–203(a) [13] and 4–204(a) [14] of the Criminal Law Article.

---

**12.** As re-codified, § 4–201(c) provided:

"(c) *Handgun.*—

"(1) 'Handgun' means a pistol, revolver, or other firearm capable of being concealed on the person.

"(2) 'Handgun' includes a short-barreled shotgun and a short-barreled rifle.

"(3) 'Handgun' does not include a shotgun, rifle, or antique firearm."

**13.** That section provided:

"(a) *Prohibited.*—

"(1) Except as provided in subsection (b) of this section, a person may not:

"(i) wear, carry, or transport a handgun, whether concealed or open, on or about the person;

"(ii) wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State;

"(iii) violate item (i) or (ii) of this paragraph while on public school property in the State; or

"(iv) violate item (i) or (ii) of this paragraph with the deliberate purpose of injuring or killing another person.

"(2) There is a rebuttable presumption that a person who transports a handgun under paragraph (1)(ii) of this subsection transports the handgun knowingly."

Comparison of the re-codified provision with the one it replaced confirms the Revisor's conclusion that it "is new language derived without substantive change"

**14.** As re-codified, § 4–204(a) provided:

"(a) *Prohibited.*—A person may not use an antique firearm capable of being concealed on the person or any handgun in the commission of a crime of violence, as defined in Article 27, § 441 of the Code, or any felony, whether the antique firearm or handgun is operable or inoperable at the time of the crime."

By Laws 2003, ch. 17, the reference to Article 27, § 441 was replaced by one to § 5–101 of the Public Safety Article. During the last legislative session, § 4–204 was amended to include its own definition section to define "firearm." *See* Laws 2011, ch. 164 and ch.165. That new subsection (a), largely identical to § 5–101(h), now provides:

About a year later, *see* Laws 2003, ch. 5, § 2, Article 27, § 445(d), to which extensive revisions had been made over the years, was re-codified as § 5–133(b) and, as we have seen, § 441 was re-codified as § 5–101.

Nevertheless, the term, "handgun," which necessarily required interpretation of the term, "firearm," was defined by this Court in *Howell*. The definition we settled upon was one based on language similar to, if not identical to, that of the federal Gun Control Act of 1968, 18 U.S.C. § 921(3) (1968). *See Howell*, 278 Md. at 391 n. 1, 364 A.2d at 798 n. 1 (quoting the Attorney General that "[i]t is abundantly clear that the term handgun as defined [in the Maryland statute] covers the same weapons as contemplated in the definition of firearm contained in the 'Gun Control Act of 1968' "). The appellant in *Howell* was convicted on a number of charges, including the unlawful use of a handgun in the commission of a crime in violation of Article 27, § 36B (d) of the Maryland Code (1957, 1976 Repl.Vol.). *Id.* at 390, 364 A.2d at 798. Although the robbery victim thought the gun held to his head was a .22 caliber, in actuality, the appellant had been holding a tear gas gun, capable only of expelling fine particles highly irritating to the eyes. *Id.* at 390–91, 364 A.2d at 798.

This Court had to decide whether a tear gas pistol was a handgun within the meaning of Maryland Code (1957, 1976 Repl.Vol.) Article 27, § 36F (1957, 1976 Repl.Vol.). *Id.* at 390, 364 A.2d at 798. We held that it was not. *Id.* at 390, 364 A.2d at 797. Instead, the Court concluded that, in order to be a handgun, the weapon must be "a firearm or it must be readily or easily convertible into a firearm ... [F]urther[,] ... to be a firearm it must propel a missile by gunpowder or some such

---

"(a) *'Firearm' defined.*—(1) In this section, 'firearm' means:
  "(i) a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; or
  "(ii) the frame or receiver of such a weapon.
"(b) *Prohibited.*—A person may not use a firearm in the commission of a crime of violence, as defined in § 5–101 of the Public Safety Article, or any felony, whether the firearm is operable or inoperable at the time of the crime."

similar explosive[.]" *Id.* at 394–96, 364 A.2d at 800–801. The Court clearly was cognizant of the federal definition of "firearm," and the structure of its opinion and its analysis indicate a purpose of ensuring that this definition was consistent. In a footnote, we acknowledged the federal statute and the Attorney General's arguments:

"The Attorney General in 58 Op. Att'y Gen. 572, 576 (1973) opined that '[i]t is abundantly clear that the term handgun as defined [in the Maryland statute] covers the same weapons as contemplated in the definition of firearm contained in the 'Gun Control Act of 1968,' codified at 18 U.S.C. 921(3),' stating that the latter statute 'defines firearm as "... any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." ' The federal act says that a 'destructive device' is 'any type of weapon ... by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter....' "

*Id.* at 391, n. 1, 364 A.2d at 798, n. 1. Further, having distinguished the cases the State relied on and consulted various dictionaries for definitions of handguns, we reasoned,

"If we regard the statute here as intending to define the term handgun as 'any pistol, revolver, or *other* firearm' (Emphasis added.) then the only way that 'no word, clause, sentence, or phrase [may not] be rendered surplusage, superfluous, meaningless, or nugatory,' is to conclude that the presence of the word 'other' before 'firearm' is an indication that the General Assembly intended that to be a 'handgun' the device under consideration must be a firearm."

*Id.* at 394, 364 A.2d at 800.

After our decision in *Howell,* it was well settled that a handgun within the meaning of § 36F "cover[ed] the same

weapons as contemplated in the definition of 'firearm' contained in the Gun Control Act, 18 U.S.C. 921 (1968)." 58 Op. Att'y Gen. 567, 576 (1973); *See also* Maryland Code (1957, 1982 Repl.Vol.) Article 27, § 36F (citing 58 Op. Att'y Gen. 567 (1973) and *Howell v. State* ) (stating "[t]he term 'handgun' as defined in this section covers the same weapons as contemplated in the definition of 'firearm,' contained in the Gun Control Act, 18 U.S.C. § 922"). Moreover, as we have seen, the General Assembly amended § 441, in effect codifying the *Howell* definition of "firearm," borrowed from federal law, by largely adopting the language from the federal Gun Control Act that *Howell* construed and which formed the basis for that definition and inserting it in subsection (n). In so doing, the Legislature was aware, and in any event, is presumed to have been aware, of this Court's interpretation of "firearm" in light of that federal statute. *Consol. Constr. Servs. v. Simpson*, 372 Md. 434, 461, 813 A.2d 260, 276 (2002) (When interpreting the attorney's lien statute, we stated that "Legislature is presumed to have been aware of our case law regarding the purpose and definition of such liens, *i.e.*, charging liens."); *Atl. Sea–Con, Ltd. v. Robert Dann Co.*, 321 Md. 275, 292, 582 A.2d 981, 990 (1990) (stating "we presume that the Legislature was cognizant, when it enacted and later revised the [Miller Act], of the Supreme Court's interpretation of the Miller Act ...."); *Best Drywall v. Berry*, 108 Md.App. 381, 392–93, 672 A.2d 116, 122 (1996) (Holding that legislature's intent in using the term "residence" was contrary to equating it with "domicile," after gleaning such a principle from case law, because a statute's "meaning is dependent on its contextual use."). Despite the remaining issues associated with the implementation of the *Howell* definition of "firearm," *see, e.g., York v. State*, 56 Md.App. 222, 230, 467 A.2d 552, 556 (1983), that definition has remained constant and accepted.

Section 5–133 provides that "(b) ... [a] person may not possess a regulated firearm if the person: (1) has been convicted of a disqualifying crime[,]" as listed in § 5–133(c). Section 5–101(h) defines "firearm," which subsection (a) indicates applies to the Regulated Firearm Subtitle. The majori-

ty interprets this definition as being identical to the federal "firearm" definition located in § 921(a)(3), Title 18 of the United States Code. *See Moore v. State*, 135 n. 8, 34 A.3d at 522 n. 8. In actuality, Maryland's "firearm" definition, which has also been used to define the term "handgun," though originally borrowed from federal law, has a state-specific meaning as a result of court decisions and Legislative acceptance, *see* Maryland Code (1957, 1982 Repl.Vol.) Article 27, § 36F, and consistent amendments and enactments over the past several decades.

The majority traces the roots of § 5–101 to § 441 without acknowledging the relationship between § 445 and §§ 36B and 36F and, in particular, that § 36F defined the objects whose possession, under the enumerated circumstances, § 445 proscribed. In fact, although, when *Howell* was decided, all of the statutes involved "Crimes and Punishments" and appeared in the same Article, the majority simply dismisses § 36F as "a different handgun statute." [15] *Moore*, 137, 34 A.3d at 524.

---

**15.** The majority, in support of its proposition, cites to Henry C. Black, Handbook on the Construction and Interpretation of the Laws 171–72 (2d ed.1911), stating "[t]here is no rule of construction which requires the same meaning always to be given to the same word, when used in different connections in the same statute or in different statutes." *Moore v. State*, 139, 34 A.3d at 525 (2011). The majority fails to address, or follow, the rule from *Taxiera v. Malkus*, 320 Md. 471, 481, 578 A.2d 761, 765 (1990), which states,

"[W]here two statutes purport to deal with the same subject matter, they must be construed together as if they were not inconsistent with one another. *Police Comm'r v. Dowling*, 281 Md. 412, 418, 379 A.2d 1007 (1977); *Comm'n on Md. Discipline v. Bendler*, 280 Md. 326, 330, 373 A.2d 1232 (1977). In this regard, the courts strongly favor a harmonious interpretation in construing the related statutes which gives full effect to both statutes, even where they were enacted at different times and without relation to one another. *Farmers & Merchants Bank v. Schlossberg*, 306 Md. 48, 56, 507 A.2d 172 (1986)."

I submit that §§ 5–133 and 4–203 of the Maryland Code purport to deal with the same subject matter, firearms. Further, I do not believe, and there is no evidence to show, that the Legislature had an intent to create a definition of "firearm" in § 5–101(h) that was contrary to, and not harmonious with, § 4–201(c) and its *Howell*-based interpretation.

Sections 4–201(c), 4–203(a) and 4–204(a) are a part of a single statutory scheme: they are all a part of Title 4 because each is a crime that involves a weapon and, because the common weapon is a handgun, they also share space in Subtitle 2. More specifically, critical to a prosecution under §§ 4–203 and 4–204 is the definition of a handgun, a question that must be answered, as *Howell* demonstrates, by reference to § 4–201(c). Although not a part of the same Title and Subtitle, and, indeed, is in another Article entirely, § 5–133(b) is nevertheless related to, and, I submit, shares a legislative scheme with these provisions. It too is a handgun offense, to the proof of which the definition of handgun is central. As *Howell* pointed out, given the structure and wording of the reference to "firearm" in the definition of handgun, a " 'handgun' must be a firearm." *Id.* at 394, 364 A.2d at 800. Where the "regulated firearm" otherwise falls within the definition of handgun, the opposite is also true. Section 5–101(h) also is related and cannot be exempted from the scheme. Although that section defines "firearm," the definition of "handgun," as *Howell* made clear, *id.*, necessarily encompassed, and thus required reference to and construction of that term. As a matter of fact, as we have seen, *id.* at 391 n. 1, 364 A.2d at 798 n. 1, in construing § 36B (c), the predecessor to § 4–201(c), the Court considered the very language that § 5–101(h) uses, *albeit* it did so in the context of the federal act upon which the statute is based.

Although, as the majority emphasizes, which, by the way, I concede, *Howell* interpreted, not § 441(i), the predecessor to § 5–101(h), but § 36F, in which the definition of "handgun," as used in § 36B (d), was set forth. There was a good reason that the Court did not interpret § 441(i): it did not then exist and no Maryland statute defined "firearm." To be sure, then present § 441(c) used the term, "firearm," in its definition of "handgun," as did § 36B (b), but neither further defined or explained that term. More to the point, however, as *Howell* makes clear, the Court was aware of, and, indeed, in defining that term, considered the definition of "firearm" in the 'Gun Control Act of 1968,' codified at 18 U.S.C. 921(3), which used

virtually the same language as the General Assembly did in enacting § 5–101 and, later, § 4–201(a).

The majority, after an extensive plain meaning analysis of § 5–101(h), states that the Maryland Gun Violence Act, which codified the definition of "firearm" in § 441(i) of Article 27, created a new definition consistent with federal law, evidenced by the nearly-identical language contained in the § 921(a)(3) of Title 18, United States Code. *Moore*, 133–34, 34 A.3d at 521–22. It goes on to say, in a footnote,

> "To the extent that Moore contends that the new definition was not consistent with federal law, we find no merit in his argument. In addition to the legislative history that indicates as much, the definition that the General Assembly chose for the definition of "firearm" was virtually identical to language that was found in Section 921(a)(3) of Title 18, United States Code."

*Id.* at 135 n. 8, 34 A.3d at 522 n. 8. Despite the majority's pushing for such strict adherence to federal law regarding § 5–101(h), and thereafter citing a number of cases noting "that federal courts have overwhelmingly determined that operability is not a requirement under the similar federal statute," *id*, 136, 34 A.3d at 523, and therefore concluding that operability is not required for a § 5–133(c) conviction, the majority quickly dismisses *Howell* and its progeny, reasoning that the definition involved there "pertained to offenses for 'wearing and carrying handguns during the commission of certain crimes, which were enumerated in Section 36 of Article 27." *Moore*, 138, 34 A.3d at 524.The majority then quotes the language of *Howell*, which states that "the term handgun as defined [in the Maryland statute] covers the same weapons as contemplated in the definition of firearm contained in the [federal statute.]" *Moore*, 138, 34 A.3d at 524 (internal quotation marks omitted). The majority, in interpreting § 5–101, concludes that the "firearm" definition therein strictly coincides with the federal definition, in that operability is not required, while § 4–201 loosely coincides with the federal definition, and operability is required.

The logic of the majority's construction escapes me. As we have seen, this Court took account of the federal statute on which § 5–101 is based when it, construing § 36B (b), defined "handgun," a critical component of which is that it be a "firearm." Consequently, the Court necessarily defined "firearm." Following that decision, it has been the law of this State that, to be a handgun, the object must be a firearm, and that it be an operable firearm. *See Brown v. State,* 182 Md.App. 138, 168 n. 16, 957 A.2d 654, 671 n. 16 (2008) (noting that "[a] weapon must be an operable firearm to sustain a conviction for carrying a handgun"); *Powell v. State,* 140 Md.App. 479, 486, 780 A.2d 1219, 1223 (2001) (emphasizing that under *Howell v. State,* "for a weapon to be a 'handgun,' it must be a firearm, and for a weapon to be a firearm, it must function as a firearm or be 'readily convertible into a firearm' "); *Wright v. State,* 70 Md.App. 616, 620–21, 522 A.2d 401, 402–403 (1987) (reversing a handgun conviction where the jury had not been instructed on the requirement of operability); *York,* 56 Md.App. at 229, 467 A.2d at 556 (recognizing that "a gun which, at the time of its use, is not a firearm ('explosive of projectiles') and not readily convertible to that purpose, is not a handgun under § 36B(d)"); *United States v. Robson,* 391 F.Supp.2d 383, 390 (D.Md.2005) (the United States District Court, in applying Maryland law in a prosecution for transporting handguns onto a federal enclave, recognized that Maryland is a jurisdiction which requires proof of operability as a prerequisite to conviction for handgun offenses).

That was the case whether the cases involved, as in the above cited cases, "wearing, carrying or transporting" or "use of" a handgun crimes, or, as the following cases exclusively involve, the possession proscribed by § 5–133(c).[16] *See Parker v. State,* 402 Md. 372, 377, 936 A.2d 862, 865 (2007) (where the Court noted that "an operable, loaded .357 magnum handgun" was recovered from the appellant's residence); *McCain v.*

---

**16.** In candor, in none of these cases was operability of the handgun the issue.

*State,* 194 Md.App. 252, 264, 4 A.3d 53, 59 (2010) (where the court noted that, during trial, "[t]he prosecutor represented to the court that the handgun recovered . . . had been tested and found to be an operable 'high-power nine millimeter luger handgun.' In addition, the prosecutor proffered that appellant had been convicted of assault in the second degree in 1999. Neither proffer was contested by appellant."); *Thompson v. State,* 192 Md.App. 653, 666, 995 A.2d 1030, 1037 (2010) (where the court noted that "a report indicating that the aforementioned gun was operable was submitted without objection, as well as an exhibit indicating that appellant was prohibited, under Maryland law, from possessing a regulated firearm based on a prior disqualifying conviction . . ."); *Nash v. State,* 191 Md.App. 386, 392, 991 A.2d 831, 835 (2010) (Where the court noted that, at trial, the appellant moved for judgment of acquittal on the grounds that the State failed to show that the weapon was fireable because there was no evidence that the gun had been tested. In response, the State argued that their firearm expert had 13 years experience with guns and provided uncontroverted testimony that this was an operable weapon. The court denied the defendant's motion).[17]

The mere subsequent adoption of pre-existing and well known federal statute language simply does not, and cannot, negate or undermine in any way the *Howell* ruling. More is required to indicate a legislative intent to reverse that decision. There is nothing more in that regard in this case. The more there is augurs against the position the majority espouses.

As I have previously pointed out, concurrently with the enactment of a definition of "firearm," which largely mirrored

---

**17.** *Nash v. State* was pending appeal when the decision in *Hicks v. State,* 189 Md.App. 112, 139, 984 A.2d 246 (2009) was announced. Citing *Hicks,* the court noted, in its opinion:

"Although appellant did not raise on appeal the issue he raised below regarding the operability of the firearm, we note that the State is not required to demonstrate that a firearm is operable to obtain a conviction under P.S. § 5–133(c)."

*Nash,* 191 Md.App. at 405, note 8, 991 A.2d at 842.

the federal Gun Control Act of 1968, the General Assembly amended § 36B (d) to make clear that conviction of that offense did not depend on whether the handgun used was operable, that conviction could occur "whether the antique firearm or handgun is operable or inoperable at the time of the crime." To my mind, this indicates quite clearly that, rather than a mere presumption, *see Simpson,* 372 Md. at 461, 813 A.2d at 276, the Legislature was very much aware of, and accepted, the *Howell* decision and its operability requirement, but wanted to confine its effect to crimes that did not involve the offensive use of the handgun. That certainly would address some of the concerns expressed about the operability requirement. *See e.g., York,* 56 Md.App. at 230, 467 A.2d at 556 ("We do not think the legislature, in its concern for the protection of citizens against handguns used in crimes, intended a weapon to be excluded from the handgun category because of nice calculations of percentages or the relative strengths of potential users."). It also explains an interesting and significant omission: no similar amendment to the admittedly related "wearing and carrying" statute, § 36B (b), or to § 445, § 5–133(c)'s predecessor.

A rationale for removing the State's burden of proving that a handgun used in the commission of a crime was operable was clearly stated by the Governor's Commission on Gun Violence:

"The Commission heard testimony that this issue is critical in the prosecution of crimes involving the use of a handgun and [requiring operability] poses an extra element of proof for prosecutors. Moreover, some Commissioners stated that it was irrelevant to a crime victim, who believed that the handgun was capable of being fired, whether the weapon was operable or not. In other words, the impact intended by the criminal and felt by the victim is the same irrespective of whether the gun was operable. Accordingly, the Commission concluded that the proof that the handgun was operable was essentially irrelevant to the criminal act in question and voted to recommend elimination of this element of proof."

Report of Governor's Commission on Gun Violence at 18. To my mind, the General Assembly's action in amending § 36B (d) was consistent with the Commission's sentiments. Equally significant, none of the other handgun statutes, § 36 B(b), prohibiting wearing, carrying, or transporting a handgun; § 281A (b), prohibiting possession of a firearm in relation to a drug trafficking crime; § 291(A)(b), prohibiting possession of a firearm after conviction of a drug offense; or § 445, prohibiting possession of a firearm by, *inter alia,* a person convicted of a disqualifying crime, were amended to include this exemption language.

It makes sense not to require proof that a brandished handgun is operable where the charged crime is an active one, involving violence and a victim, who, as a result, is, and is intended to be, intimidated; in such circumstances, the handgun's operability simply may be deemed irrelevant. This rationale does not apply in the case of a statute that prohibits a certain class of persons from merely possessing a handgun.[18] Indeed, operability is more relevant in such cases, where the handgun is not actively being used to harm or intimidate, but is available should the offender decide to revert to engaging in activity harmful to society sometime in the future. Indeed, subsequent to the Gun Violence Act of 1996, this Court and the Court of Special Appeals have continued to apply the *Howell* "firearm" definition in cases involving §§ 4–203 and 5–133. *See Pye v. State,* 397 Md. 626, 628, 919 A.2d 632, 634 (2007) (appellant was convicted of both 5–133 and 4–203, and the court noted that the gun proved to be operable); *Brown,* 182 Md.App. at 168 n. 16, 957 A.2d at 671 n. 16 (noting that "[a] weapon must be an operable firearm to sustain a conviction for carrying a handgun"). If the majority is correct, despite the *Howell* decision and the fact that only § 4–204 was amended to delete the operability requirement, § 4–203 would

---

18. Additionally, there would seem to be due process implications where a person in mere possession of an inoperable weapon, fundamentally a useless heap of metal, is convicted of possessing a regulated firearm. I do not believe the statute gives proper notice that any weapon, whether operable or not, could incriminate a person under § 5–133.

be the only one of the three statutes referencing "firearm" still to require operability. This simply is not sensible. Moreover, had the Legislature intended the same result in all cases in which handguns were involved, it certainly knew how to provide for it. *Balto. Harbor Charters v. Ayd,* 365 Md. 366, 386, 780 A.2d 303, 314 (2001) (holding that "[w]e have long applied the principle of statutory construction, *'expressio unis est exclusio alterius,'* the expression of one thing is the exclusion of another") (internal citations omitted). It chose not to.

In 2009, thirteen years after Maryland had codified the definition of "firearm" borrowed from federal law, the issue of whether proof of operability was a requirement for a conviction under § 5–133 was squarely presented to the Court of Special Appeals in *Hicks v. State,* 189 Md.App. 112, 984 A.2d 246 (2009). Without discussing *Howell,* or any of the § 5–133 cases referenced herein, focusing instead on the language, "frame or receiver," borrowed from the federal statute, 58 Op. Att'y Gen. at 576, the intermediate appellate court held:

"We have found no Maryland cases that directly speak to the precise issue before us. We are persuaded, however, that a firearm need not be operable to sustain a conviction under Pub. Safety § 5–133(b). As noted, 'firearm,' the operative term here, is defined as 'a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; or the frame or receiver of such a weapon.'

\*          \*          \*

"Since the federal definition of 'firearm' is substantially the same as that in Pub. Safety, § 5–101(h), and the corresponding federal and Maryland statutes regulate essentially the same conduct, we view the federal courts' interpretation of the term 'firearm' as persuasive. We hold that, in order to obtain a conviction under Pub. Safety § 5–133, the State need not prove that the firearm in question was operable."

*Id.* at 136, 139, 984 A.2d at 260, 262. I find this rationale to be the product of illogic and incomplete analysis of Maryland's statutory scheme and history and the relevant case law.

To the majority, the Public Safety Article and the Criminal Law Article contain mutually exclusive definitions of the word "firearm." *See Moore,* 137–39, 34 A.3d at 524–25. The majority is wrong. It is true, there is now a definition of "firearm" in the Criminal Law Article, it is, however, a "Johnny Come Lately," having just recently been added. When we defined "handgun," and in the process, "firearm," there was no statutory definition of "firearm," although the statute we construed, § 36F, as well as several others, including the predecessor to § 5–101, § 441, referred to "firearm." The definition of which we applied to each of these statutes and the case law reflects that reality. It also makes sense, as we pointed out, our definition of "handgun" encompasses "firearm." Moreover, when the Court defined "handgun," in the process defining "firearm," all of the statutes were a part of one statutory scheme. Although they are today spread out over two Articles, they still are intimately related and are a part of a well developed scheme to regulate and punish gun crimes. House Judiciary Committee Bill Analysis for Senate Bill 215 at *1 (Md.1996). Thus, it is an incorrect and illogical assumption to read "firearm" as used in § 5–133, and defined in § 5–101(h), as completely separate and based upon a different definition than that articulated by this Court in *Howell,* admittedly applicable to § 4–203, wearing and carrying a handgun, a crime quite similar in nature, and, but for the exemption enacted in 1996, to § 4–204, use in crime. For these reasons, a plain meaning analysis is not available or appropriate in the construction of § 5–101(h). Such an analysis is possible only "[i]f the language of the statute is clear and unambiguous, [rendering it unnecessary to] look beyond the statute's provisions...." *Ray v. State,* 410 Md. 384, 978 A.2d 736 (2009). The *Howell* decision defining "firearm," being relevant to its interpretation, renders the later enacted statute, defining the same term, but not purporting to overrule the earlier one, at the least ambiguous.

But even a plain meaning analysis does not justify the result the majority strains to reach: the language of § 5–101(h) requires that the subject weapon expel; be designed to expel; may be readily converted to expel a projectile by the action of an explosive, or to be the frame or receiver of a weapon that expels, is designed to expel, or may readily be converted to expel a projectile. Rather than not being language "that requires operability," as the majority states, *Moore*, 127, 34 A.3d at 518, I believe this language very clearly does the opposite, it requires that the weapon, designed to expel a projectile, operate or be readily converted to an operable state. Such a reading of the statute, moreover, takes account of all the words in the first clause and gives them meaning. Moreover, the statute states that a "firearm" includes "the frame or receiver of any such weapon." Of course, the frame or receiver of a weapon—with nothing more—is a component of, but not a, firearm. Consequently, that provision alone introduces an ambiguity which must be resolved.[19]

This is in contradistinction to the majority's approach: it focuses on the phrase, "is designed to," and concludes that the mere design alone makes a weapon a "firearm" for purposes of the § 5–101(h) violation. *Id.* at 129–30, 34 A.3d at 519. The majority bolsters this conclusion by relying on § 5–101(h)(1)(ii), including in the definition of "firearm," "the frame or receiver of such a weapon," pointing out that "[a] frame or receiver that provides housing for the internal components of the weapon is clearly not capable of 'expel[ling] a projectile by the action of an explosive,' absent the requisite internal components." *Id.* at 131, 34 A.3d at 520.

It is well settled that, when interpreting statutes, we seek "to ensure that no word, clause, sentence or phrase is ren-

---

**19.** The statute's reference to "the frame or receiver of any *such* weapon," (emphasis added) is, I believe, a reference to a weapon that expels, is designed to expel, or is readily capable of expelling a projectile. I do not take this language to mean that the frame or receiver of an inoperable weapon suffices. Had that been the Legislature's intent, the words "any such weapon," referring back to subsection (1)(i), would not have been used.

dered surplusage, superfluous, meaningless or nugatory." *Ray*, 410 Md. at 404–05, 978 A.2d at 747–48 (internal citations and quotation marks omitted). Applying this canon of construction, it follows that, if subsection (h)(1)(i) were interpreted to mean that a conviction for illegal possession of a prohibited firearm could be based solely on evidence that the weapon was "designed" to expel a projectile, regardless of its actual capacity to do so, the requirement that it "expel a projectile . . . or may be readily converted to expel a projectile by the action of an explosive" would be totally superfluous.[20] Similarly, with regard to the "frame or receiver" requirement, if it trumps the rest of the statute, one can only wonder why the General Assembly bothered to say anything more.

Section 5–101(h)(1)(i) defines "firearm" using a series of phrases, which, as characterized by the majority, "contemplates three distinct levels of *functionality* under which a firearm may fall[.]" *Moore*, 130, 34 A.3d at 519 (emphasis added). By using the term "functionality," I believe the majority concedes that, to be a firearm, the subject weapon must have some level of operability. *See* The American Heritage Dictionary 551, 956. (3rd ed. 1997) (Defining "operable" as "[b]eing such that operation is possible[; ]possible to put into practice; practicable" and defining "functional" as "[d]esigned for or adapted to a particular function or use; [c]apable of performing; *operative.*") (emphasis added). Curiously, rather than analyze the statute as a whole, which, I submit, leads inexorably to the conclusion that the statute requires the weapon, at least, to be *capable* of expulsion, and, if not capable at that exact moment in time, "readily" convert-

---

**20.** The same logic applies to Section 4–204(a) of the Criminal Law Article, which states

"A person may not use an antique firearm capable of being concealed on the person or any handgun in the commission of a crime of violence, as defined in [what is now] § 5–101 of the Public Safety Article, or any felony, whether the antique firearm or handgun is operable or inoperable at the time of the crime."

If Section 5–101 in fact defined a firearm as being an operable or inoperable weapon, the language of Section 4–204 that states "whether . . . operable or inoperable" would be superfluous.

ed to do so, the majority then focuses on the literal meaning of the words "designed to expel."

The majority last argues that, because Maryland intended to model its own Act after the federal Gun Control Act of 1968, and because the federal government does not require operability, then Maryland's Act, as a whole, does not either. *See Moore*, 133–36, 34 A.3d at 521–23. I simply do not find this argument convincing in light of *Howell*, Maryland's long history of requiring, *albeit* by judicial decision, that handguns be operable, and the number of differences between the federal act and our State's act. Further, I agree with the petitioner, although this Court, in *Dept. of Public Safety v. Berg*, 342 Md. 126, 139, 674 A.2d 513, 519 (1996), held that, in applying § 5–133(c), Maryland law enforcement official's *may* appropriately consider federal gun control laws, there simply is no basis for the assertion that Maryland's own gun control laws be interpreted in perfect conformity with federal law.

I dissent.

Judge GREENE authorizes me to state that he joins in the dissent.